739 So.2d 1150 (1999)
Thomas Harrison PROVENZANO, Appellant,
v.
STATE of Florida, Appellee.
No. 95,849.
Supreme Court of Florida.
July 1, 1999.
*1151 John W. Moser, Capital Collateral Regional CounselMiddle Region, Michael P. Reiter, Chief Assistant CCRCMiddle Region, Mark S. Gruber, Assistant CCRCMiddle Region, and Martin J. McClain, Special Assistant CCRCMiddle Region, Tampa, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Carol M. Dittmar and Katherine V. Blanco, Assistant Attorneys General, Tampa, Florida, for Appellee.
PER CURIAM.
Thomas Harrison Provenzano, a prisoner under sentence of death, appeals the circuit court's denial of various motions, including the denial of his third motion for postconviction relief. We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
Provenzano was convicted of the first-degree murder of a bailiff in the Orange County Courthouse and the attempted murder of another bailiff and a corrections officer. The facts of the crime are set forth in Provenzano v. State, 497 So.2d 1177 (Fla.1986), cert. denied, 481 U.S. 1024, 107 S.Ct. 1912, 95 L.Ed.2d 518 (1987). At trial, the jury recommended the death penalty by a vote of seven to five. The judge imposed the death sentence, finding five aggravating circumstances: (1) the defendant had been previously convicted of a violent felony (the contemporaneous attempted murders); (2) in committing the murder, the defendant knowingly created a great risk of death to many persons; (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; (4) the murder was committed to disrupt or hinder the lawful exercise of a governmental function or the enforcement of laws; and (5) the murder was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification. The judge found one statutory mitigating circumstance: the defendant had no significant history of prior criminal behavior. On appeal, this Court affirmed Provenzano's convictions and affirmed the sentences imposed, including the death penalty.
After the governor signed Provenzano's first death warrant on March 7, 1989, Provenzano *1152 filed his first motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850, which was summarily denied by the circuit court. Provenzano appealed the denial of the rule 3.850 motion and filed a petition for habeas corpus in this Court. In order to give the matter full consideration, this Court entered an order staying Provenzano's execution. Subsequently, this Court affirmed the denial of the rule 3.850 motion and rejected the petition for habeas corpus. See Provenzano v. Dugger, 561 So.2d 541 (Fla.1990). This Court found all but one of the issues raised in the appeal to be either procedurally barred or without merit. However, this Court held that Provenzano was entitled to disclosure of those portions of the state attorney's file covered by chapter 119 of the Florida Statutes. Provenzano was given sixty days from disclosure to file a new rule 3.850 motion asserting any Brady claims arising from the contents of the file.
After disclosure of the file, Provenzano filed a second rule 3.850 motion. The trial court summarily denied the motion and this Court affirmed the denial. See Provenzano v. State, 616 So.2d 428 (Fla.1993). This Court held that all of the issues were either procedurally barred or without merit.
Provenzano filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of Florida. The district court found that all of Provenzano's claims were either procedurally barred or without merit and thus denied habeas relief. See Provenzano v. Singletary, 3 F.Supp.2d 1353 (M.D.Fla. 1997). The Eleventh Circuit Court of Appeals affirmed the denial of habeas relief. See Provenzano v. Singletary, 148 F.3d 1327 (11th Cir.1998).
The governor signed Provenzano's second death warrant on June 9, 1999. The execution is scheduled for July 7, 1999. This Court ordered that any further proceedings in this case be expedited. On June 23, 1999, the circuit court held a preliminary hearing to consider Provenzano's most recent 3.850 motion. In a very comprehensive and well-reasoned order, the circuit court subsequently denied Provenzano's 3.850 motion. The circuit court also denied several other motions by Provenzano. He appeals the denial of these motions to this Court.
In his most recent rule 3.850 motion, Provenzano raises eight claims. In his first claim, Provenzano alleges the circuit court erred in failing to grant him a full and fair hearing on his postconviction motion. In Kennedy v. State, 547 So.2d 912, 913 (Fla.1989), this Court stated that "[a] motion for postconviction relief can be denied without an evidentiary hearing when the motion and the record conclusively demonstrate that the movant is entitled to no relief." Therefore, it is necessary to address each of Provenzano's claims to determine whether they are legally sufficient to require an evidentiary hearing. See Provenzano, 561 So.2d at 543-44.
We address Provenzano's second and third claims together. In his second claim, Provenzano contends that documents have been withheld by the State in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In his third claim, Provenzano argues that his access to files and records in the possession of the Department of Corrections (DOC) have been withheld in violation of chapter 119, Florida Statutes. We agree with the circuit court that Provenzano is not entitled to relief on either of these assertions. Regarding Provenzano's Brady claim, we find that Provenzano has failed to meet the first prong of the Brady test as articulated by this Court in Buenoano v. State, 708 So.2d 941, 948 (Fla.1998) ("Buenoano must establish that: (1) the State possessed evidence favorable to her."). The record and motion conclusively demonstrate that Provenzano has failed to establish that the State possessed evidence favorable to him. Regarding Provenzano's public records claim, we find that the record conclusively *1153 establishes that Provenzano is entitled to no relief.
In claim four, Provenzano argues that Florida's electric chair in its present condition constitutes cruel or unusual punishment or both. Provenzano contends that the chair's electrical circuitry has malfunctioned in the four executions since our decision in Jones v. State, 701 So.2d 76 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1297, 140 L.Ed.2d 335 (1998), causing the inmates being electrocuted to suffer because death was not instantaneous, contrary to Jones, in which we affirmed a circuit court's finding after evidentiary hearings that Florida's electric chair is "in excellent condition." Id. at 77. Provenzano maintains that the circuit court in Jones relied upon false evidence in that work had been done on the electric chair that was not presented in the Jones evidentiary hearings. Provenzano also alleges that the DOC's protocol for executions is flawed and is not being followed, based on newly discovered evidence of reports by electrical engineers contracting with DOC to work on the electric chair.
The circuit court below rejected Provenzano's electric chair claim, finding the bulk of the claim to have been decided adversely to Provenzano in Jones. The circuit court further dismissed Provenzano's claim of newly discovered evidence, finding that "the fact that DOC has engaged in an active testing and maintenance procedures following the Medina execution and following the Jones hearing establishes that DOC is attempting to maintain the reliability of the electric chair and its components and ensure that no future problems occur during the execution by electrocution process." Finally, the circuit court dismissed Provenzano's claim regarding DOC's protocol for executions, noting that the electrical engineer's report cited by Provenzano explained that variations are normal due to the size differences of particular inmates.
As to Provenzano's electric-chair claims, we find no error in the circuit court's reliance upon our decision in Jones. In 1998, DOC conducted four executions subsequent to our decision in Jones. Prior to each of these executions, the inmate who was under warrant claimed that the electric chair was cruel or unusual punishment in that apparent malfunctions had caused inmates to suffer during previous executions because death was not instantaneous. We found no merit in these similar claims or in the related claim of death row inmate Eduardo Lopez. See Lopez v. Singletary, 719 So.2d 287 (Fla.1998) (order), cert. denied, ___ U.S. ___, 119 S.Ct. 892, 142 L.Ed.2d 790 (1999); Remeta v. Singletary, 717 So.2d 536 (Fla.1998) (order); Buenoano v. State, 717 So.2d 529 (Fla. 1998) (order); Stano v. Singletary, 692 So.2d 180 (Fla.1997); Jones, 701 So.2d at 80. As to the claim concerning work performed on the electric chair since the most recent executions, we affirm the circuit court's decision that there is an insufficient basis alleged to overcome the presumption that members of the executive branch will properly perform their duties in carrying out the next execution. See Buenoano v. State, 565 So.2d 309, 311 (Fla.1990). We therefore reject Provenzano's claims as to the condition and operation of the electric chair. We do not reach any claim as to what might occur in future executions because we find such claims to be speculative.
Once again, we are troubled that there is an indication that DOC has not followed the protocol established for the appropriate functioning of the electric chair and carrying out of the death penalty. In Remeta, No. 92,679, 717 So.2d 536, this Court entered an order requiring DOC to follow the previously published protocol ("Execution Day Procedures" and "Testing Procedures for Electric Chair," attached as appendices to this opinion)[1] for carrying *1154 out executions. Despite questions raised regarding whether the protocol has been followed, there has been no showing that any of the last four executions caused "unnecessary and wanton pain" or involved "torture or a lingering death." Jones, 701 So.2d at 79. Based upon that, and the State's continued representation that the protocol will immediately render any inmate being executed incapable of experiencing unnecessary and wanton pain, we decline to stay this execution.
However, we deem it appropriate that the results of any and all tests and any other records generated relating to the operation and functioning of the electric chair be promptly submitted to this Court, the Attorney General's Office, the regional offices of the Capital Collateral Regional Counsel (CCRC), and the capital cases statewide registry of attorneys, on an ongoing basis. By this, we contemplate an open file policy relating to any information regarding the operation and functioning of the electric chair. In light of the recent history regarding the execution of persons sentenced to death, we further direct DOC to certify prior to the execution of Provenzano and all other inmates under death warrant that the electric chair is able to perform consistent with the "Execution Day Procedures" and "Testing Procedures for Electric Chair." DOC must send copies of this certification to the Attorney General's Office and the attorney representing the inmate under death warrant.
In his fifth claim, Provenzano asserts that he is being denied his constitutional right to due process to receive effective representation. To support this claim, counsel from CCRC-Middle note that they were appointed June 18, 1999, as Provenzano's collateral counsel. However, in a hearing regarding Provenzano's motion for determination of counsel, private attorney Terri Backhus, who recently represented Provenzano in his federal habeas claim, indicated her willingness to assist CCRC in these proceedings. In addition, attorney Martin McClain, who presented oral argument before the Court in this matter, previously represented Provenzano in an earlier 3.850 proceeding. CCRC has failed to support its plea for more time with any specific issue which may be a viable claim for relief. Therefore, we agree with the circuit court that there is no merit to this claim.
In claim six, collateral counsel alleges that Provenzano is incompetent to proceed in his postconviction proceedings. We conclude that the circuit court did not err in denying relief on this claim. In Carter v. State, 706 So.2d 873, 875 (Fla. 1997), this Court stated that "a judicial determination of competency is required when there are reasonable grounds to believe that a capital defendant is incompetent to proceed in postconviction proceedings in which factual matters are at issue, the development or resolution of which require the defendant's input." (Emphasis added.) Thus, Provenzano is only entitled to a competency determination if any factual matters are at issue. Collateral counsel claims that he needs Provenzano's assistance in developing (1) the extent of the abuse that Provenzano suffered as a child, (2) the extent of Provenzano's head injuries which cause headaches or dizziness, and (3) the adequacy of trial counsel's representation. All three of these issues are procedurally barred. The first two presumably relate to mitigation, which should have been argued on direct appeal. The third relates to ineffective assistance of trial counsel, which should have been raised in Provenzano's first rule 3.850 motion. Hence, Provenzano has failed to meet the Carter test because there are no factual matters at issue. Therefore, we agree with the circuit court that Provenzano is not entitled to a competency hearing.
Provenzano argues in claim seven that the trial court failed to utilize its *1155 discretionary authority and trial counsel failed to request an individualized sequestered voir dire in light of the extensive publicity in this case. We agree with the circuit court that Provenzano is not entitled to relief on this claim, as this claim is procedurally barred. See Smith v. State, 445 So.2d 323, 325 (Fla.1983) ("Issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack."); Lambrix v. Singletary, 641 So.2d 847, 848-49 (Fla.1994) ("Because ineffective assistance of counsel claims have been considered and rejected in a previous petition, Lambrix is procedurally barred from raising such claims again in a subsequent habeas petition.") (citing Aldridge v. State, 503 So.2d 1257, 1258 (Fla.1987), for the proposition that "a defendant [is] procedurally barred from raising an ineffective assistance of counsel claim when such a claim has been raised previously even though the current claim is based on a different issue").
Based on the foregoing, we find that the trial court did not err in summarily denying Provenzano's 3.850 motion. No evidentiary hearing was warranted in this case where the motion and the record conclusively demonstrate that Provenzano is entitled to no relief. See Kennedy, 547 So.2d at 913-14.
Finally, in claim eight, Provenzano maintains that the trial court erred in denying his motion for counsel to present a clemency application to the governor. We conclude that the trial court did not err in denying this request. Provenzano has already had a clemency hearing before Governor Martinez and the Clemency Board in 1987. Provenzano was represented by counsel at that hearing and the Clemency Board granted him no relief. In the recent death warrant, Governor Bush attested to the fact that "it has been determined that Executive Clemency, as authorized by Article IV, Section 8(a), Florida Constitution, is not appropriate." In Bundy v. State, 497 So.2d 1209, 1211 (Fla.1986), this Court rejected a similar argument:
In the final claim raised under his 3.850 motion, appellant contends that he must be allowed time to prepare and present an application for executive clemency before sentence may be carried out in this case. In the death warrant authorizing appellant's execution, the governor attests to the fact that "it has been determined that Executive Clemency, as authorized by Article IV, Section 8(a), Florida Constitution, is not appropriate." It is not our prerogative to second-guess the application of this exclusive executive function. First, the principle of separation of powers requires the judiciary to adopt an extremely cautious approach in analyzing questions involving this admitted matter of executive grace. Sullivan v. Askew, 348 So.2d 312 (Fla.), cert. denied, 434 U.S. 878, 98 S.Ct. 232, 54 L.Ed.2d 159 (1977). As noted in In re Advisory Opinion of the Governor, 334 So.2d 561, 562-63 (Fla.1976), "[t]his Court has always viewed the pardon powers expressed in the Constitution as being peculiarly within the domain of the executive branch of government." See also Ex Parte White, 131 Fla. 83, 178 So. 876 (1938).
As in Bundy, Provenzano has requested counsel for a second clemency hearing. Thus, we find no merit to this issue.
Accordingly, we affirm the circuit court's denial of the various motions filed in this case, including the denial of Provenzano's motion for postconviction relief. No motion for rehearing will be permitted.
It is so ordered.
HARDING, C.J., and WELLS and QUINCE, JJ., concur.
PARIENTE, J., concurs with an opinion, in which LEWIS, J., concurs.
LEWIS, J., concurs specially with an opinion, in which PARIENTE, J., concurs.
*1156 ANSTEAD, J., concurs in part and dissents in part with an opinion, in which SHAW, J., concurs.
PARIENTE, J. concurring.
I concur with the majority's decision to deny an evidentiary hearing in this case as to Provenzano's last-minute claim that Florida's electric chair in its present condition constitutes cruel and/or unusual punishment. Although I agree with the majority that Provenzano has not made a threshold showing to warrant an evidentiary hearing and to require us to revisit this Court's decision in Jones v. State, 701 So.2d 76 (Fla.1997), I write separately to express my concern over whether the protocol established by the Department of Corrections has been followed. This issue was brought to our attention after Jones in Remeta v. Singletary, No. 92,679, 717 So.2d 536 (Fla. Mar. 30, 1998), causing us to issue an order on March 30, 1998 stating that: "The Court directs the Department of Corrections to follow the previously published protocol for carrying out the execution."
At that time of our order in Remeta, I stated in a separate concurrence that "I join in urging the Legislature to consider enacting lethal injection as set forth in Justice Harding's specially concurring opinion in Jones, 701 So.2d at 80-81 (Harding, J., specially concurring)." Remeta, No. 92,679, 717 So.2d 536 (Fla. Mar. 30, 1998). The Legislature did not follow the urging of Chief Justice Harding in his specially concurring opinion in Jones, joined in by Justice Overton, so that Florida remains one of a small minority of states selecting electrocution as the sole method of execution.
As this Court recognized in Jones, it remains this Court's constitutional responsibility to determine whether the manner in which the method of execution specified by the Legislature is administered constitutes cruel and unusual punishment. Our decision in Jones finding that electrocution in the state's electric chair is not cruel or unusual punishment was based on the state of the record at that time. We relied in Jones on "several significant findings of fact" made by the trial court including that: "Florida' electric chair-its apparatus, equipment and electric circuitry-is in excellent condition," and that "[a]ll inmates who will hereafter be executed in Florida's electric chair will suffer no conscious pain." Jones, 701 So.2d at 77. I find nothing in our prior opinion in Jones that would preclude this Court from revisiting that decision, should the factual predicate upon which the opinion was based change as a result of subsequently developed evidence.
LEWIS, J., concurs.
LEWIS, J., specially concurring.
Today, we again enter the mind-bending realm of attempting to logically and analytically address the mechanism of human destruction through electrocution, a subject matter that is not well-suited for discussion without humanitarian concerns, no matter what view one professes to accept. The citizens of Florida, through their elected officials, have designated death by electrocution as the means of imposing the ultimate sanction on society's worst criminal offenders, and the many problems associated with this process were the subject of extensive litigation less than two years ago in this Court's decision in Jones v. State, 701 So.2d 76 (Fla.1997). Therefore, it is with much concern that we must revisit the constitutionality of Florida's chosen method of imposing death.
The discussion and debate will be never ending so long as this mechanism exists, and although we must have stability in legal precedent to respect the rule of law, we must never fear confrontation with precedent when the factual underpinnings of such precedent lack validity. See, e.g., Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 864, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (declining to overrule Roe v. Wade "[b]ecause neither the factual underpinnings of Roe's central holding nor our understanding *1157 of it has changed (and because no other indication of weakened precedent has been shown)"); Weiand v. State, 24 Fla. L. Weekly S124, S129 n. 12, 732 So.2d 1044 (Fla.1999) (reasoning "[a]lthough stare decisis is fundamentally important in our system of justice, it is not `an ironclad and unwavering rule' so that we must bend to the `voice of the past, however outmoded or meaningless that voice may have become.' The doctrine of stare decisis must bend when there has been a significant change in circumstances since the adoption of the legal rule.") (citations omitted). The Jones decision is facially predicated upon the existence of competent substantial evidence to support very specific findings of fact, including the condition of mechanisms existing at that time and the status of scientific information available. The absence of conscious pain was an essential factual element of the judgment affirmed by this Court. The entire execution process in Florida is grounded in an understanding that one subject to death by electrocution is rendered unconscious so as to eliminate the infliction of unnecessary pain, as opposed to the ultimate punishment of death. As reflected in the majority opinion, there is now at least some credible indication that the Department of Corrections has not followed the protocol specifically established for the death process. However, there appears to be a missing evidentiary element as to a nexus between protocol variances and a breach of the line of constitutionality as established by both the United States Supreme Court and this Court. If it were not for the requirement of continued representations by the State along with the delivery of the certification required prior to the imposition of this execution mechanism, as now established by this Court, I would conclude that the factual basis upon which Jones was premised has been sufficiently called into question to require a full evidentiary hearing.
It is my belief that Floridians, including those victimized by the inmates subject to this process, contemplate the end result of death, not the infliction of pain in the process. We must be ever vigilant to analyze and search for an understanding of the execution procedures to make certain that we walk within the boundaries of constitutional requirements. The indications that there have been variances from the established protocol suggest that the mechanism itself must be subject to question as to its continued validity in constitutional terms. Recognizing that the people of this State have enacted law for the ultimate result of death, it is troubling that the implementation of the process continues to walk the edge of constitutional propriety, thus threatening the entire concept even after the substantial discussion presented by this Court in Jones.
PARIENTE, J., concurs.
ANSTEAD, J., concurring in part, dissenting in part:
It remains my view that death by electrocution constitutes cruel and unusual punishment in violation of both the state and federal constitutions. See Jones v. State, 701 So.2d 76, 88 (Fla.1997) (Anstead, J., dissenting).
SHAW, J., concurs.

APPENDIX

EXECUTION DAY PROCEDURES

Effective for Executions After April 16, 1997
The following designated staff shall perform specific job assignments related to executions. In the absence of any the assigned staff, the person or persons acting in their stead shall assume the described specific duties.
For executions scheduled for ________, the following times apply. If an execution is scheduled for any other time of the day, exact hour differences shall be implemented.
DATE OF EXECUTION: ________
*1158 CONDEMNED INMATE'S NAME/DC NUMBER: _________
_____ The _______________ shall personally prepare and serve last meal. Eating utensils allowed shall be a plate and a spoon.
_____ A. Beginning at _____, the only staff authorized on _____________.
 ______________
 ______________
 ______________
 ______________
B. The _______ shall supervise the shaving of the condemned inmate's head and right leg.
C. Official witnesses shall report to Florida State Prison's Administration Building no later than _______. The witnesses shall be greeted by two designated Department of Corrections' staff, and, as a group, shall be escorted by the designated staff to the Main Entrance of Florida State Prison, cleared by security, and then escorted to the staff dining room, where they shall remain until escorted to the witness room of the execution chamber by the designated escort staff.
_____ Authorized media witnesses shall be picked up at the designated media onlooker area located at New River Correctional Institution by two designated Department of Corrections' escort staff, transported to the Main Entrance of Florida State Prison, as a group, cleared by security, and escorted to the population visiting park, where they shall remain until escorted to the witness room of the execution chamber by the designated escort staff.
A. The condemned inmate shall be escorted to the shower area where the _____ shall supervise the showering of the condemned inmate. Immediately thereafter, the inmate shall be returned to the assigned cell and issued underwear, a pair of trousers, a dress shirt or blouse (as appropriate), and socks. The _____ shall be responsible for the delivery of the clothing.
B. The _____ shall be instructed by _____ to forward all calls to the Execution Chamber from the Governor's Office through switchboard extension ____. Should institutional telephone lines fail at any time during this process, the _____ shall immediately advise the Command Center, which is located within hearing range of the switchboard.
C. The designated ______, the designated _______, two designated _______, and _______ shall report to the execution chamber for preparations. The designated _______ shall check the telephones in the chamber and ensure that a fully-charged cellular telephone is in the execution chamber. Sample telephone calls shall be placed from each telephone to assure proper operation.
D. The designated _______ shall check the public address system for proper operation.
E. The designated _______ shall ready the equipment. The _______ shall mix the saturated saline solution and place the two natural sea sponges in the solution. (See Testing Procedures for Electric Chair for composition of saturated saline solution.)
_______ A. The designated _______ shall establish telephone communication with the Governor's Office on behalf of _______. The phone line shall remain open to the Governor's Office during the entire execution proceeding.
B. The _______ shall verify water _____ has been turned off.
The _______ is present in the execution chamber.
A. The _______ shall assure that the salt-free, hypoallergenic electrically-conductive gel is applied to the crown of the shaven head and calf of the right leg in a total application of approximately 4 ounces. _____________

*1159 B. The _______ shall read the Death Warrant to the condemned inmate.
C. Official witnesses shall be secured in the witness room of the execution chamber by two designated Department of Corrections' escort staff no later than _______.
D. Authorized media witnesses shall be secured in the witness room of the execution chamber by two designated Department of Corrections' escort staff no later than _______.
_____ Witness room of the execution chamber is secured. The only persons authorized in the witness room are:
12 official witnesses (includes 1 Department of Corrections' Inspector General designee)
4 alternate official witnesses
1 nurse or medical technician
12 authorized media representatives
1 Department of Corrections' Information Services representative
1 designated Department of Corrections' staff escort
1 designated Department of Corrections' security officer

Any exception to the above-designated persons must be approved by ____________.
_____ The execution chamber is secured. The only persons authorized in the execution chamber are:
 _______________
 _______________
 _______________
 _______________

Any exception to the above designated persons must be approved by ____________.
_______ A. The _______ shall apply the restraints to the condemned inmate for escort into the execution chamber.
B. The _____ and the _____ shall escort the condemned inmate to the execution chamber. (The _____ may designate other or additional staff if the condemned inmate is female.)
C. The designated _____ shall record the time the inmate enters the execution chamber.
Time Inmate Enters Chamber: _____
D. The _____ and the _____ shall place the condemned inmate in the electric chair.
E. The _____ shall secure lap, chest, arm, and forearm straps.
F. When the inmate is secured, the _____ and _____ shall remove the restraint apparatus and secure the ankle straps.
G. The _____ and the _____ shall secure the leg piece and sponge to the inmate's right leg calf. Those involved in this process shall assure that the sponge covers all areas of the electrode, preventing any direct contact of the brass electrode and the condemned man's skin, and shall assure that the sponge is sufficiently wet (slightly dripping). As the leg piece is secured, any dripping/running saline solution shall be dried with clean towels.
_____ A. The _____ shall permit the condemned inmate to make a last statement.
B. The _____ and the _____ shall secure the chin strap.
C. The _____ shall secure the head piece assembly. Those involved in this process shall assure that the sponge covers all areas of the electrode, preventing any direct contact of the brass electrode and the condemned inmate's skin, and shall assure that the sponge is sufficiently wet (slightly dripping). As the head piece is secured, any dripping/running saline solution shall be dried with clean towels.
D. _____ shall then proceed to the outside open telephone line to inquire of any possible stays of execution. If *1160 there are no stays, _____ shall proceed with the execution.
E. The _____ shall close the safety switch.
F. _____ shall activate the execution control panel.
G. _____ shall give the signal to to engage the execution switch and the automatic cycle will begin.
H. The designated _____ or _____ shall record the time the execution switch is engaged.
Time Execution Switch Engaged: _____
I. The automatic cycle begins with the programmed 2,300 volts, 9.5 amps, for 8 seconds; 1,000 volts, 4 amps for 22 seconds; and 2,300 volts, 9.5 amps for 8 seconds. When the cycle is complete, the equipment is manually disconnected by _____. The safety switch is then opened by _____.
J. The designated _____ shall record the time the execution switch is disengaged.
Time Execution Switch Disengaged: _____
K. The _____ directs the _____ (or other designated _____ ) to conduct their examination of the condemned inmate.
L. If the condemned inmate is not pronounced dead by the _____, _____ shall order the execution cycle to be repeated.
M. Once the condemned inmate is pronounced dead by _____, the designated _____ shall record the time death is pronounced.
Time Inmate Pronounced Dead: _____
N. The _____ shall notify the Governor via the open phone line that the sentence has been carried out and the time the inmate is pronounced dead.
O. The designated _____ shall announce that the sentence has been carried out and directs witnesses and media to exit the witness room of the execution chamber.

"The sentence of the State of Florida vs. _____ has been carried out at _____ am/pm. Please exit to the rear at this time."

P. The official witnesses, except the designated _____, and media pool shall then be escorted from the witness room of the execution chamber by the designated Department of Corrections' escort staff.
Q. The designated _____ witness shall remain in the witness chamber. After all other witnesses have exited the building, the _____ shall be allowed entry to the execution chamber for evidence collection. The _____ shall be allowed to collect both the head and leg sponges, which shall be placed in a plastic gag and securely sealed, inspect equipment, make notes, and depart with these materials. If an unusual incident/problem should occur during an execution, the _____ shall also be allowed to photograph narrow and specific electrode contact points only.

POST-EXECUTION
_____ A. The _____ shall coordinate the entry of hearse attendants for recovery of the condemned inmate's body.
B. The condemned inmate's body shall be removed from the chair by hearse attendants under the supervision of _____.
C. The designated _____ shall provide compensation to the executioner.
D. The _____ shall obtain certification of death from the _____ and shall deliver the certification to the hearse attendants prior to their departure.
All members of the execution team shall immediately proceed to the Superintendent's Conference Room for debriefing.
*1161 AS SOON AS POSSIBLE
A. The Superintendent shall forward the Death Warrant to the Governor, indicating that the execution has been carried out.
B. The Superintendent shall file a copy of the Death Warrant with the Circuit Court in which the condemned inmate was convicted and sentenced to death.
C. The Correctional Senior Sentence Specialist shall advise Central Office Records by teletype of the condemned inmate's name and the date and time of death by execution.
/s/______________
________, Secretary
Dated:____________
Verification of Execution Proceedings:
________________
Superintendent
_______________
Designated Captain/Lieutenant

TESTING PROCEDURES FOR ELECTRIC CHAIR
(April 16, 1997)

I. Testing Procedures:

A. Schedule of Testing:

The following equipment testing procedures shall be conducted by the electrician, assisted by the maintenance staff or the superintendent's designee, during (1) the first two weeks of each calendar quarter, (2) within ten calendar days after each death warrant is signed, and (3) on the day prior to a scheduled execution. The schedule referenced in (1) shall become effective during the quarter commencing July 1, 1997. The schedule referenced in (2) shall become effective for all death warrants signed after the date of these testing procedures. The schedule referenced in (3) shall become effective for any execution scheduled after the date of these testing procedures.
B. Pre-Test Equipment Examination and Procedures:

1. Saturated Saline Solution:

The electrician shall mix the saturated saline solution at the beginning of the testing procedures. A saturated saline solution is professionally described as a mixture of salt and water where, after having thoroughly stirred the mixture, undissolved salt remains in the bottom of the container. This composition can be attained through the mixture of three gallons of water with one gallon of salt.
2. Natural Sea Sponges:

Only natural sea sponges shall be used for testing and executions. The sponges selected for the testing shall be inspected to detect tears, foreign debris, or other defects that could hamper the efficiency of the sponge. The dimensions of the sponges shall also be checked to insure sufficient coverage of the electrodes. If a sponge is determined unsuitable, it shall be discarded and a new sponge selected. [NOTE: A new natural sea sponge shall be used for every test and for every execution.]
3. Emergency Generator:

The electrician shall start the emergency generator for each test. Power is directed only to the reactor switch gear during the test, eliminating emergency generated power to any other area but the execution chamber.
4. Safety Switch and Cables:

Check safety switch to assure the breakers are in the open position. Check attached cables to verify serviceable condition.
5. Chart Recorder:

The electrician shall test the calibration of the chart recorder and shall visually and manually check the pens for adequate ink. To test the calibration of the chart recorder, the electrician shall compare the amperage and voltage meters located on the execution *1162 panel with the amperage and voltage on the chart recorder. If the amperages and voltages readings are similar, the chart recorder is accepted as calibrated. If the chart recorder is determined to be uncalibrated, the electrician shall immediately have a professional electrical engineer recalibrate the chart recorder before proceeding with further testing. Faulty pens shall be replaced by the electrician.
6. Reactor Switch Gear:

After checking safety switch and cables, check reactor switch gear for proper voltage. Energize the control circuit breaker. Engage control circuit breaker to execution panels.
7. Execution Control Panel:

Check control panel for proper voltage.
8. Head Piece/Leg Piece/Leather Lace/Leather Body Straps/Chin Strap/Sponges:

Examine head piece for corrosion, screen breaks or indications of wear. Examine leg piece for corrosion or indications of wear. Examine leather lace, leather body straps, and chin strap for tears or indications of wear. Defects shall be corrected or equipment replaced prior to further testing.
C. The Test:

After the equipment is examined, remove the natural sea sponges from the saturated saline solution and position in the head piece and leg piece to cover the electrodes. Connect the head piece and leg piece to a repeatable resistive load to measure voltage and amperage. Energize power to the execution control panel. Close safety switch. Energize the execution switch. Begin automatic cycle with the programmed 2,300 volts, 9.5 amps, for 8 seconds; 1,000 volts, 4 amps for 22 seconds; and 2,300 volts, 9.5 amps for 8 seconds. After cycling is completed, manually disconnect the equipment at both the execution panel and the safety switch. Shut down all other related operational equipment.
D. Post-Test Equipment Examination and Procedures:

1. Immediately following completion of this test, examine electrodes, sponges, leather, and all related equipment for damage or wear. If any equipment or material is found to be damaged, worn or faulty, it shall be replaced.
2. If any test fails for any reason, the problem shall be identified, corrected, and the testing process repeated until the testing procedures are successfully completed at all levels.
3. The results of the testing procedures shall be written on the chart recorder paper and shall be turned over to the superintendent. The chart recorder paper shall include the date of the testing and the start and finish times and shall be signed by the electrician conducting the testing procedures.
4. The superintendent shall provide the Secretary of the Department of Corrections with written results of each test performed.

II Recertification of High Voltage Gloves:

High voltage gloves shall be recertified annually by a commercial electrical professional engineer as required by the American electrical standards for certification. The written certification shall remain with the gloves at all times. The date for annual recertification will be determined from the last certification date.

III. Recalibration of Chart Recorder:

The chart record shall be recalibrated by a professional electrical engineer prior to each execution, but under no circumstances less than once per year.

*1163 IV Other Miscellaneous Equipment Testing:

A. Telephone/Cellular Telephones:

The superintendent's designee shall check the telephone lines to the Death Chamber and shall check the cellular telephone for battery-powered operation. Sample telephone calls shall be made from each instrument.
B. Public Address System:

Maintenance staff shall check the public address system for proper operation during each testing session and prior to all executions.
/s/_______________
________, SECRETARY
Dated:____________
NOTES
[1] The "Execution Day Procedures" document and the "Testing Procedures for Electric Chair" document were previously produced pursuant to a public records request. Information which was exempt from production has been redacted from the "Execution day Procedures" document.