940 So.2d 1112 (2006)
Arthur Dennis RUTHERFORD, Appellant,
v.
STATE of Florida, Appellee.
Arthur Dennis Rutherford, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC06-1931, SC06-1946.
Supreme Court of Florida.
October 12, 2006.
*1113 Linda McDermott and Martin J. McClain of McClain and McDermott, P.A., Wilton Manors, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Charmaine M. Millsaps, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
Arthur Dennis Rutherford, a prisoner under sentence of death and an active death warrant, appeals the circuit court's order denying without an evidentiary hearing his third successive motion for postconviction relief and the circuit court's order dismissing his motion to correct an illegal sentence. Rutherford also petitions the Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.; art. V, § 3(b)(9), Fla. Const. For the reasons stated below, we affirm the circuit court's orders and deny Rutherford's habeas petition.

FACTS AND PROCEDURAL HISTORY
The execution of Arthur Dennis Rutherford is set for October 18, 2006. The execution had been initially set for January 31, 2006, but was stayed by the United States Supreme Court while it considered whether Rutherford could litigate a challenge to Florida's lethal injection procedures in the federal courts under 42 U.S.C. § 1983. On September 22, 2006, after the stay expired, the Governor rescheduled Rutherford's execution for the period between October 9, 2006, and October 23, 2006. The warden chose October 18 as the date of the execution.
This Court's last opinion, issued on January 27, 2006, explains in detail the factual background and procedural history of this case. See Rutherford v. State, 926 So.2d 1100, 1103-07 (Fla.), cert. denied, ___ U.S. ___, 126 S.Ct. 1191, 163 L.Ed.2d 1145 (2006). In 1986, Rutherford was convicted of the first-degree murder of Stella Salamon and sentenced to death. Rutherford knew the victim, a 63-year old widow who lived alone, because she had hired him to do odd jobs, one of which was the installation of sliding glass doors. Soon after the installation, the doors had to be replaced because they did not close and lock properly. Mrs. Salamon was not satisfied with Rutherford's work and expressed uneasiness to a friend about Rutherford's continued presence at her home. Before this murder,
[d]uring the summer of 1985, Rutherford told his friend Harold Attaway that he planned to kill a woman and place *1114 her body in her bathtub to make her death look like an accident. Rutherford also told a long-time business associate, Sherman Pittman, that he was going to get money by forcing a woman to write him a check and then putting her in the bathtub. If the woman initially refused to make out the check, Rutherford explained that he would "get her by that arm and she would sign." It was then that Rutherford bragged that he would do the crime but not the time. About a week after making those statements, Rutherford again told Attaway about his homicidal plan. Rutherford also told his uncle that they could get easy money by knocking a woman Rutherford worked for in the head. Unfortunately, none of these three men took Rutherford seriously enough to report his plans to the authorities.
. . . .
At 7:00 [on the morning of the murder,] Rutherford and Attaway went to retrieve the old doors from Mrs. Salamon's garage. When they reached the house, Rutherford told Attaway that he had a gun in his van and said, "If I reach for that gun, you'll know I mean business." Attaway testified that this was the first time he really believed that Rutherford might actually hurt someone. . . . While they were loading the doors, Attaway overheard Mrs. Salamon say to Rutherford, "You can just forget about the money."
. . . .
Around noon, Rutherford went to see Mary Frances Heaton. . . . He showed her one of Mrs. Salamon's checks and asked her to fill it out. Heaton cannot read or write other than to sign her name, so she called for her [fourteen]-year-old niece, Elizabeth. Rutherford promised Elizabeth money if she would fill out the check as instructed. Elizabeth filled out the check the way Rutherford told her to, making it payable to Heaton, but she did not sign anyone's name on it.
Rutherford told Heaton that he owed her money for work she had done for him and asked her to accompany him. He took Heaton to Santa Rosa State Bank, gave her the check, and sent her into the bank to cash it. Because of the blank signature line, the teller refused to cash the check; Heaton returned to Rutherford's van and told him.
Rutherford responded by driving them to the nearby woods, where he took out a wallet, checkbook, and credit cards wrapped in a shirt, and threw the bundle into the trees. He also signed Mrs. Salamon's name onto the check, and then went back to the bank. Outside the bank, Heaton watched as Rutherford endorsed Heaton's name on the check. . . . Heaton re-entered the bank, and this time she successfully cashed the check and left with $2,000 in one hundred dollar bills. Rutherford gave Heaton $500 of those funds, and she in turn gave Elizabeth $5 for filling out the check.
Around 3:00 that afternoon, Rutherford visited his friend Johnny Perritt. He told Perritt that he had "bumped the old lady off" and showed him $1500 in cash. He wanted Perritt to hold $1400 of that amount for him. Rutherford said that he had hit the "old lady" in the head with a hammer, stripped her, and put her in the bathtub. Perritt refused to take the cash, and his mother later notified the police of Rutherford's claim to have committed a murder.
Id. at 1103-04 (quoting Rutherford v. Crosby, 385 F.3d 1300, 1302-04 (11th Cir. 2004)).
At 6:30 p.m., two neighbors discovered Mrs. Salamon's naked body floating in her *1115 bathtub, which was overflowing with water.
When the crime scene investigators arrived they found three fingerprints on the handle of the sliding door to the bathtub, one fingerprint on the tile wall of the tub, and a palm print on the window sill inside the tub with the fingers up and over the sill as though the person had grabbed it. All of those prints were later identified as Rutherford's. Blood was spattered on the bathroom walls and floor. According to an expert, the spatter pattern indicated that the blows occurred while Mrs. Salamon was sitting or kneeling on the bathroom floor.
Mrs. Salamon's naked body floated face-up in the water. She had been viciously beaten. There were bruises on her nose, chin, and mouth and a cut on the inside of her lip consistent with a hand being held forcefully over her face. Her lungs showed signs of manual asphyxiation, apparently from someone covering her nose and mouth. Her arms and knees were bruised and scraped, and her left arm was broken at the elbow. Of the three large wounds on her head, two were consistent with being struck with a blunt object or having her head slammed down. The other wound, a puncture that went all the way to the bone, appeared to be from a blow with a claw hammer or screwdriver. Her skull was fractured from one side to the other.
Id. at 1104-05 (quoting Rutherford, 385 F.3d at 1304-05).
On October 2, 1986, the jury found Rutherford guilty of first-degree murder and armed robbery. At the penalty phase, the jury recommended the death penalty by a vote of seven to five, and the trial court sentenced Rutherford to death. This Court affirmed Rutherford's conviction and sentence and the United States Supreme Court denied his petition for writ of certiorari. Rutherford v. State, 545 So.2d 853 (Fla.), cert. denied, 493 U.S. 945, 110 S.Ct. 353, 107 L.Ed.2d 341 (1989).
Rutherford vigorously pursued postconviction relief. In 1996, after conducting an evidentiary hearing on Rutherford's claims of ineffective assistance of trial counsel, the trial court denied relief and this Court affirmed. See Rutherford v. State, 727 So.2d 216 (Fla.1998). In a separately filed petition for writ of habeas corpus, Rutherford asserted numerous claims of ineffective assistance of appellate counsel and this Court likewise denied relief. Rutherford v. Moore, 774 So.2d 637 (Fla.2000). Rutherford then pursued habeas relief in the federal courts, which was eventually denied. See Rutherford v. Crosby, 385 F.3d 1300 (11th Cir.2004), cert. denied, 544 U.S. 982, 125 S.Ct. 1847, 161 L.Ed.2d 738 (2005).
Rutherford next filed a second postconviction motion in state court based on Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). The trial court summarily denied Rutherford's motion and this Court affirmed the denial on appeal. See Rutherford v. State, 880 So.2d 1212 (Fla.2004) (table report), cert. denied, 543 U.S. 1167, 125 S.Ct. 1342, 161 L.Ed.2d 142 (2005). Rutherford later filed two petitions for writ of certiorari in the United States Supreme Court. The Supreme Court denied both petitions. See Rutherford v. Florida, 543 U.S. 1167, 125 S.Ct. 1342, 161 L.Ed.2d 142 (2005) (mem.); Rutherford v. Crosby, 544 U.S. 982, 125 S.Ct. 1847, 161 L.Ed.2d 738 (2005) (mem.). Rutherford then filed a second habeas petition in this Court based on Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which was also denied. See Rutherford v. Crosby, 909 So.2d 862 (Fla.2005) (table decision).
*1116 On November 29, 2005, Governor Bush signed Rutherford's death warrant. One day prior, on November 28, 2005, Rutherford filed a third successive habeas petition in this Court in which he asserted that the trial court's decision to place him in shackles during closing arguments of the penalty phase violated the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution under Deck v. Missouri, 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005). This Court denied Rutherford's successive habeas petition by order on January 5, 2006. See Rutherford v. Crosby, 921 So.2d 629 (Fla.) (table report), cert. denied, ___ U.S. ___, 126 S.Ct. 1190, 163 L.Ed.2d 1144 (2006).
After the death warrant was signed, Rutherford filed a third postconviction motion to vacate his convictions and sentences. Rutherford's claims centered on two main issues: (1) that lethal injection procedures in Florida constituted cruel and unusual punishment; and (2) that newly obtained affidavits implicated another person, Mary Frances Heaton, in the victim's death. The trial court summarily denied the claims and we affirmed. See Rutherford, 926 So.2d at 1102. The United States Supreme Court denied certiorari and a stay of execution on January 31, 2006. See Rutherford v. Florida, ___ U.S. ___, 126 S.Ct. 1191, 163 L.Ed.2d 1145 (2006).
During this same time period, Rutherford was attempting to litigate the lethal injection issue in the federal courts. The federal district court dismissed Rutherford's claim under 42 U.S.C. § 1983, which authorizes civil suits to remedy violations of constitutional rights, and the United States Court of Appeals for the Eleventh Circuit affirmed. See Rutherford v. Crosby, 438 F.3d 1087 (11th Cir. 2006). Rutherford filed a petition for writ of certiorari and an application for stay of execution with the United States Supreme Court. The Supreme Court granted the stay on January 31, 2006. See Rutherford v. Crosby, ___ U.S. ___, 126 S.Ct. 1191, 163 L.Ed.2d 1144 (2006). On June 19, 2006, the Supreme Court granted the petition for writ of certiorari and remanded the case to the Eleventh Circuit for further consideration in light of Hill v. McDonough, ___ U.S. ___, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006). See Rutherford v. McDonough, ___ U.S. ___, 126 S.Ct. 2915, 165 L.Ed.2d 914 (2006). Upon issuance of the mandate by the United States Supreme Court on July 21, 2006, the stay terminated. See Rutherford, 126 S.Ct. at 1191 ("In the event the petition for writ of certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court."). The Eleventh Circuit subsequently reconsidered Rutherford's section 1983 claims in light of Hill and affirmed the district court's dismissal based on unnecessary delay by Rutherford in bringing the claim. See Rutherford v. McDonough, No. 06-10783, 2006 WL 2830968 (11th Cir. Oct.5, 2006).
Following the rescheduling of Rutherford's execution, Rutherford filed a fourth motion for postconviction relief under Florida Rule of Criminal Procedure 3.851 and an amendment to the motion. Rutherford raised five claims for relief. He asserted that (1) newly discovered evidence, consisting of the American Bar Association's September 2006 report evaluating Florida's death penalty system ("ABA Report"),[1] demonstrates that Rutherford's death sentence constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments; (2) Florida's clemency process is arbitrary and capricious, *1117 violating the Eighth and Fourteenth Amendments; (3) Florida's failure to recognize a freestanding actual innocence claim violates the Eighth Amendment; (4) newly discovered evidence relating to Mary Frances Heaton's role in the murder demonstrates that Rutherford's capital conviction and death sentence are constitutionally unreliable in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments; and (5) the newly discovered evidence relating to Heaton's role in the murder demonstrates that Rutherford is actually innocent.
The circuit court conducted a Huff[2] hearing on October 4, 2006, to determine whether an evidentiary hearing was required on any of these claims. On October 6, 2006, the circuit court denied Rutherford's motion without an evidentiary hearing. Rutherford also filed a motion to correct an illegal sentence under Florida Rule of Criminal Procedure 3.800(a), arguing that his death sentence is unconstitutional in light of the ABA Report. The circuit court granted the State's motion to strike, finding that Rutherford's claim was not properly raised in a motion to correct illegal sentence because the alleged illegality did not appear on the face of the record and the trial court had no authority to reconsider the constitutionality of the death penalty on grounds rejected by this Court and the United States Supreme Court.
In the instant appeal, Rutherford challenges the circuit court's denial of his rule 3.851 motion and the circuit court's dismissal of his rule 3.800(a) motion. Rutherford has also petitioned the Court for a writ of habeas corpus, in which he asserts that the ABA Report demonstrates that his death sentence should be vacated. He claims that the ABA Report constitutes empirical evidence that his sentence of death constitutes cruel and unusual punishment. He also argues that the ABA Report provides the same type of statistical analysis that led the United States Supreme Court in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), to declare the death penalty unconstitutional and led this Court to vacate all of the death sentences of those defendants then on death row. See Anderson v. State, 267 So.2d 8 (Fla.1972).

THE ABA REPORT
We first address the impact of the ABA Report because it serves as the basis for Rutherford's claims in his rule 3.800(a) and 3.851 motions, as well as in his habeas petition, that his death sentence is unconstitutional. On September 17, 2006, the American Bar Association published a report on Florida's death penalty system. The report, titled Evaluating Fairness and Accuracy in the State Death Penalty System: The Florida Death Penalty Assessment Report, analyzes Florida's death penalty laws, procedures and practices, and highlights areas in which, in the view of the assessment team, Florida "fall[s] short in the effort to afford every capital defendant fair and accurate procedures." ABA Report at iii.
We agree with the circuit court's conclusion that the ABA Report is not "newly discovered evidence." The ABA Report is a compilation of previously available information related to Florida's death penalty system and consists of legal analysis and recommendations for reform, many of which are directed to the executive and legislative branches. See ABA Report at ii ("The state assessment teams are responsible for collecting and analyzing various laws, rules, procedures, standards, and guidelines relating to the administration of *1118 the death penalty" and the assessment team's findings "are intended to serve as the bases from which [the state] can launch [a] comprehensive self-examination[].").
However, even if we were to consider the information contained in the ABA Report, nothing therein would cause this Court to recede from its decisions upholding the facial constitutionality of the death penalty. See, e.g., Hodges v. State, 885 So.2d 338, 359 & n. 9 (Fla.2004) (noting that the defendant's claim that "the death penalty statute is unconstitutional because it fails to prevent the arbitrary and capricious imposition of the death penalty, violates due process, and constitutes cruel and unusual punishment," has "consistently been determined to lack merit"); Lugo v. State, 845 So.2d 74, 119 (Fla.2003) ("We have previously rejected the claim that the death penalty system is unconstitutional as being arbitrary and capricious because it fails to limit the class of persons eligible for the death penalty."). Further, Rutherford does not allege how any of the conclusions reached in the ABA Report would render his individual death sentence unconstitutional.
For all these reasons, we affirm the circuit court's denial of the motion for postconviction relief regarding these points related to the ABA Report, we affirm the circuit court's dismissal of the motion for 3.800(a) relief, and we deny Rutherford's petition for a writ of habeas corpus.

NEWLY DISCOVERED EVIDENCE REGARDING MARY HEATON
In his second successive postconviction motion, which was filed after the death warrant was signed in November 2005, Rutherford argued that newly discovered evidence showed that Mary Heaton's involvement in the murder entitled him to a new trial. Heaton had testified at trial about the circumstances related to her cashing the check belonging to Mrs. Salamon. The allegedly newly discovered evidence was in the form of two affidavits:
Rutherford asserts newly discovered evidence in the form of affidavits by two persons relating statements made by Heaton. In the first affidavit dated December 16, 2005, Heaton's former housemate Alan Gilkerson stated that in the early 1990s, Heaton told him that "she once killed an old lady with a hammer and made it look like A.D. Rutherford committed the crime." Gilkerson stated that Heaton told him that her motive for "murdering the old lady" was to get money.
In the second affidavit dated December 23, 2005, defense investigator Michael Glantz stated that in a conversation with Heaton on December 22, 2005, Heaton confirmed that she knew Gilkerson and had previously resided with him. However, Heaton denied having told Gilkerson that she committed the murder in this case. According to Glantz's affidavit, Heaton stated that she knew the victim, had been present at the victim's home at the time of the murder, had witnessed Rutherford strike the fatal blow, and had been present when the victim's belongings were buried. Heaton claimed that she had previously provided this information to law enforcement officers during their investigation of the crime and had also tried to lead the officers to the location where the victim's belongings were buried.
Rutherford, 926 So.2d at 1107. This Court affirmed the circuit court's summary denial, stating:
Heaton's statements to Gilkerson and Glantz concerning whether she committed the murder are contradictory on their face. In her statement to Gilkerson, Heaton confessed to killing Mrs. *1119 Salamon. However, this confession is contradicted by her subsequent statement to Glantz, in which she stated that it was Rutherford who struck the fatal blow, killing Mrs. Salamon. When viewed against the impeachment evidence presented at trial concerning Heaton's mental problems and difficulty distinguishing fact from fantasy, Heaton's inconsistent statements to Gilkerson and Glantz would only serve to impeach Heaton's credibility further. Clearly, this evidence does not establish that Heaton committed the crime or that Rutherford is innocent.
At most, these conflicting versions of events suggest that Heaton's involvement in the crime may have been greater than was presented at trial. Even assuming that Heaton played a more significant role in the crime than was presented at trial, this evidence fails to satisfy the second prong of Jones [v. State, 591 So.2d 911 (Fla.1991)] when considered cumulatively with the evidence presented at trial. First, there is no probability that this evidence would produce an acquittal on retrial. Although Heaton's statements could be used to impeach her credibility and her testimony at trial concerning her involvement in the crime, these statements would not have contradicted or provided an innocent explanation for any of the other evidence presented at trial indicating that Rutherford was the perpetrator. Nor would these statements have affected [Elizabeth] Ward's uncontradicted testimony placing Rutherford in possession of the victim's check.
Further, there is no probability that this evidence would result in imposition of a sentence less than death on retrial. In this case, there was overwhelming evidence of Rutherford's guilt. Although the affidavits suggest that Heaton may have had greater involvement in the murder than she acknowledged at trial, her statements to Gilkerson and Glantz do not warrant a reasonable belief that Rutherford is less than wholly culpable for the murder. Despite the fact that Heaton stated that she was present at the time of the murder and when the victim's belongings were buried, Heaton does not state that she did anything to assist Rutherford in committing the murder or in disposing of the victim's belongings. In addition, Heaton's statements do not affect the aggravating factors found by the trial court in this case. Based on these circumstances, we conclude that the circuit court did not err in determining that Rutherford was not entitled to an evidentiary hearing on his newly discovered evidence claim.
Id. at 1109-10.
In Rutherford's third successive postconviction motion, which is at issue in this appeal, he argues that the statements of another newly discovered witness, when considered in conjunction with Gilkerson's affidavit, entitle him to relief. This new witness, Brian Adkison, gave the following sworn statement in an affidavit on September 30, 2006:
1. My name is Brian Adkison. I currently reside at the Walton County Jail in DeFuniak Springs, Florida. I have known Elizabeth Bevin for years, and we were neighbors in a trailer park in Crestview, Florida in the late 1990s.
2. During the time that Elizabeth Bevin was my neighbor, I visited her home on many occasions. I remember her aunt Mary staying with her from time to time. Mary was always taking pills, rocking, and talking. She often said, "Don't mess with me because I've killed people before." She mentioned killing a *1120 lady in Milton by beating her to death, with some sort of tool.
3. When Mary would start talking about this, Liz would tell her to shut up and quit running her mouth. Liz did not want her talking about this to me. But, one time when Liz wasn't around to stop her, Mary told me some details about the lady she'd beaten to death and how it happened. She told me that she beat the old lady to death when trying to rob the lady of money and medication. Mary said something about how she had been at the old lady's house before, so she knew what she had. There had been a plan to get the stuff. But when it went down, I guess it went wrong. I remember very clearly Mary saying to me: "I beat her to death so she couldn't talk." You don't forget when someone tells you something like that.
The circuit court, accepting the allegations contained in the affidavit as true, denied this claim for relief finding that Rutherford had presented "nothing new" and that the "affidavit(s) taken independently or cumulatively [are] insufficient to create a probability of acquittal on re-trial."
Because the motion was summarily denied, we must accept that Rutherford could not have known about the evidence at the time of trial by the use of due diligence as required under the first prong of Jones v. State, 591 So.2d 911 (Fla.1991), and that he could not have obtained the evidence earlier by the exercise of due diligence as required by rule 3.851(d)(2)(A). We agree with the trial court that Rutherford has failed to satisfy the second prong of Jones, which requires that "the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial." Id. at 915. In determining whether the evidence compels a new trial under Jones, the trial court must "consider all newly discovered evidence which would be admissible," and must "evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial." Id. at 916. This determination includes
whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether this evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.
Jones v. State, 709 So.2d 512, 521 (Fla. 1998) (citations omitted).
After reviewing the evidence presented at trial, this Court rejected Rutherford's "conten[tion] that when analyzed cumulatively . . . Heaton's subsequent statements to Gilkerson and Glantz would probably produce an acquittal or imposition of a sentence less than death on retrial." Rutherford, 926 So.2d at 1109. Rutherford now contends that when considered together, Adkison and Gilkerson's statements would, if presented to the jury, probably produce an acquittal on retrial or result in a sentence less than death. However, the facts in Adkison's affidavit do not provide any new information and, as the circuit court found, are less specific than those facts contained in Gilkerson's affidavit.
Further, in advancing his claim based on Adkison's statements, Rutherford ignores the fact that Heaton's statements to both Adkison and Gilkerson are still contradicted by her statements to Glantz. See id. ("Heaton's statements to Gilkerson and Glantz concerning whether she committed the murder are contradictory on their face."). Moreover, the fact that Heaton told Adkison that she killed "a lady in Milton by beating her to death, with some *1121 sort of tool," does not invalidate this Court's prior determination that
[a]lthough Heaton's statements could be used to impeach her credibility and her testimony at trial concerning her involvement in the crime, these statements would not have contradicted or provided an innocent explanation for any of the other evidence presented at trial indicating that Rutherford was the perpetrator. Nor would these statements have affected Ward's uncontradicted testimony placing Rutherford in possession of the victim's check.
Id. at 1110.
Adkison's affidavit also confirms this Court's prior observation that Heaton "has suffered from mental difficulties that have impaired her ability to differentiate fact from fantasy"a fact that the Court found significant in concluding that "a reasonable juror's determination of Rutherford's guilt would not be shaken by" the Gilkerson and Glantz affidavits. Id. at 1112. In other words, Heaton is simply not a reliable witness.
Finally, even if Heaton was involved in the murder, nothing that has been presented reduces Rutherford's culpability. Cf. Jones, 709 So.2d at 526 (concluding that newly discovered evidence and Brady material linking someone other than the defendant to the murder did not "weaken[] the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability") (quoting Jones v. State, 678 So.2d 309 (Fla.1996)). None of the four witnesses who testified regarding Rutherford's highly incriminating statements have recanted.[3] Nor have these statements been contradicted by any subsequent evidence. Ward has not recanted her testimony about the fact that Rutherford was in the possession of the check. The fingerprints and palm prints in the bathtub area belong to Rutherford and his explanation for being in that bathtub area was thoroughly impeached.
For all the reasons set forth above, we agree with the circuit court that the Adkison affidavit, when considered cumulatively with all the other evidence, is not such that it would probably produce an acquittal on retrial. We also conclude that there is no probability that this evidence would result in the imposition of a life sentence on retrial. Accordingly, we affirm the circuit court's summary denial of relief on this claim and on Rutherford's claim of actual innocence.

CLEMENCY PROCESS
In his last issue on appeal, Rutherford asserts that the circuit court erred in summarily denying his claim that Florida's clemency process is arbitrary and capricious and thus violates the Eighth and Fourteenth Amendments. Again, Rutherford relies on the ABA Report and argues that he was denied due process by the dismissal of his second clemency petition because there are no rules governing the process and the denial of his petition "was the equivalent of flipping a coin."[4]
*1122 The circuit court correctly denied this claim for relief. In King v. State 808 So.2d 1237, 1241 n. 5, 1246 (Fla.2002), this Court concluded that the defendant's claim that Florida's clemency process violates due process and equal protection was meritless. In Glock v. Moore, 776 So.2d 243, 252 (Fla.2001), this Court considered the defendant's claim that he was denied due process during a second clemency proceeding because he was "denied the right to present mitigating evidence and denied the right to counsel." The Court concluded that its prior decision in Bundy v. State, 497 So.2d 1209, 1211 (Fla.1986), controlled:
In Bundy v. State, this Court rejected a similar argument:
In the final claim raised under his 3.850 motion, appellant contends that he must be allowed time to prepare and present an application for executive clemency before sentence may be carried out in this case. In the death warrant authorizing appellant's execution, the governor attests to the fact that "it has been determined that Executive Clemency, as authorized by Article IV, Section 8(a), Florida Constitution, is not appropriate." It is not our prerogative to second-guess the application of this exclusive executive function. First, the principle of separation of powers requires the judiciary to adopt an extremely cautious approach in analyzing questions involving this admitted matter of executive grace. Sullivan v. Askew, 348 So.2d 312 (Fla.), cert. denied, 434 U.S. 878, 98 S.Ct. 232, 54 L.Ed.2d 159 (1977). As noted in In re Advisory Opinion of the Governor, 334 So.2d 561, 562-63 (Fla.1976), "[t]his Court has always viewed the pardon powers expressed in the Constitution as being peculiarly within the domain of the executive branch of government." See also Ex Parte White, 131 Fla. 83, 178 So. 876 (1938).
497 So.2d 1209, 1211 (Fla.1986), quoted in Provenzano v. State, 739 So.2d 1150, 1155 (Fla.1999). As in Bundy and Provenzano, Glock now seeks counsel for a second clemency hearing. Although Glock contends that Provenzano and Bundy differ from this case because the Governor, rather than Glock, has initiated the clemency proceeding, this is a distinction without a difference. Moreover, for the reasons stated in Bundy, we reject Glock's arguments with regard to his right to present evidence. Accordingly, we find no due process violation and no merit to Glock's clemency claim.
Glock, 776 So.2d at 252-53.
In Bundy, this Court also declined to "say that the executive branch was required to go through the motions of holding a second proceeding when it could well have properly determined in the first that appellant was not and never would be a likely candidate for executive clemency." Bundy, 497 So.2d at 1211.
In Rutherford's case, there is no dispute that he was given the opportunity to be heard and was represented by counsel during his first clemency proceeding. Further, we reject Rutherford's argument that the ABA Report requires us to reconsider our prior decisions rejecting constitutional challenges to Florida's clemency process. Accordingly, we affirm the denial of Rutherford's *1123 constitutional attack on the clemency process.

CONCLUSION
For the reasons explained above, we affirm the circuit court's orders denying Rutherford's motion for postconviction relief and dismissing Rutherford's motion to correct an illegal sentence. We also deny Rutherford's petition for a writ of habeas corpus. No motion for rehearing will be entertained.
It is so ordered.
LEWIS, C.J., and WELLS, PARIENTE, QUINCE, and CANTERO, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion.
BELL, J., recused.
ANSTEAD, J., concurring in part and dissenting in part.
I concur in the majority opinion in all respects save one, the requirement of an evidentiary hearing in order to properly evaluate the newly discovered evidence of Mary Heaton's role in the murder for which Rutherford is to be executed.
We must remember that it is not only Rutherford's guilt but also the death penalty imposed that may be affected by this new evidence. Even without this evidence a jury voted for death by the narrowest of margins, seven-to-five, just one vote short of a recommendation for life. With that background it is essential that the credibility and reliability of this new evidence be evaluated in the crucible of an evidentiary hearing where testimony must be presented under oath and the State given a full opportunity for cross-examination. In turn, and because of the trial court's first hand ability to evaluate the evidence presented, our confidence in the outcome will be qualitatively increased. The trial jury's narrow vote demands no less.
NOTES
[1] See American Bar Association, Evaluating Fairness and Accuracy in the State Death Penalty System: The Florida Death Penalty Assessment Report (Sept.2006).
[2] Huff v. State, 622 So.2d 982 (Fla.1993).
[3] We summarized this testimony in our prior decision:

One witness testified that Rutherford said he planned to kill a woman and place her body in a bathtub. Another witness testified that Rutherford said that he would force a woman to write him a check and then put her in a bathtub, and a third witness testified that Rutherford said that he could get easy money by knocking a woman he worked for in the head. A fourth witness testified that Rutherford told him on the day of the murder that he had killed "the old lady" by hitting her in the head with a hammer, and then had put her in the bathtub.
Rutherford, 926 So.2d at 1109.
[4] This flipping of a coin analogy is from Justice O'Connor's separate opinion in Ohio Adult Parole Auth. v. Woodard, 523 U.S. 272, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998), in which she opined that "some minimal procedural safeguards apply to clemency proceedings," and that "[j]udicial intervention might, for example, be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency." Id. at 289, 118 S.Ct. 1244 (O'Connor, J., concurring in part and concurring in the judgment).