[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS

ELEVENTH CIRCUIT

September 21, 2004

THOMAS  K. KAHN

CLERK

_____

No. 03-13188

_____

D.C. Docket No. 01-00115-CV-3-LAC

ARTHUR D. RUTHERFORD,

Petitioner-Appellant,

versus

JAMES V. CROSBY,

Respondent-Appellee.

_____

Appeal from the United States District Court for the
Northern District of Florida

_____

**(September 21, 2004)**

Before CARNES, HULL and WILSON, Circuit Judges.

CARNES, Circuit Judge:

Arthur D. Rutherford told a friend that he planned to rob and murder a woman, bragging that he "wouldn't do the time but he was damn sure gonna do the crime." He carried out the first part of his boast when he brutally murdered a widow who lived alone; he could not pull off the second part, and since 1986 he has been doing the time for that crime on death row. The bottom line question in this appeal is whether the death sentence imposed upon Rutherford by a Florida court can be carried out without violating the Constitution. The answer is that it can be.

## I.

## A.

During the summer of 1985, Rutherford told his friend Harold Attaway that he planned to kill a woman and place her body in her bathtub to make her death look like an accident. Rutherford also told a long-time business associate, Sherman Pittman, that he was going to get money by forcing a woman to write him a check and then putting her in the bathtub. If the woman initially refused to make out the check, Rutherford explained that he would "get her by that arm and she would sign." It was then that Rutherford bragged that he would do the crime but not the time. About a week after making those statements, Rutherford again told Attaway about his homicidal plan. Rutherford also told his uncle that they could

2

get easy money by knocking a woman Rutherford worked for in the head. Unfortunately, none of these three men took Rutherford seriously enough to report his plans to the authorities.  If any of them had, Rutherford's murder of Stella Salamon a week later could have been prevented.

Mrs. Salamon, a 63-year-old widow originally from Australia, lived alone in Santa Rosa County, Florida with her two Pekingese dogs since her husband had died unexpectedly from a heart attack two years earlier.  Other than a sister-in-law in Massachusetts, she had no family in this country.

Rutherford, who hired out to do odd jobs, installed sliding glass doors in the doorway leading from Mrs. Salamon's patio to her kitchen. Before long, Mrs. Salamon had those sliding glass doors replaced because they did not close and lock properly.  She told her long-time friend and next-door neighbor Beverly Elkins that the unlocked doors made her nervous and that she wondered if Rutherford had intentionally made the doors so that she could not lock them. Mrs. Salamon also said that Rutherford kept coming to her house and acted as though he was "casing the joint."

It is unclear whether Mrs. Salamon notified Rutherford about the problems with the doors, but on the morning of August 21, 1985, Rutherford asked Attaway to come along with him when he went to repair the doors he had installed for Mrs.

Salamon.  When they got to her house, she told them she had those doors replaced.  Attaway left to get money to give Mrs. Salamon as a refund on the doors.  Rutherford stayed behind at Mrs. Salamon's house.

Around noon that day, Mrs. Salamon received a call from her friend Lois LaVaugh.  Mrs. Salamon told Ms. LaVaugh that she was nervous because Rutherford had been at her house for "quite awhile."  Ms. LaVaugh drove over there and found Rutherford sitting shirtless on Mrs. Salamon's porch.  Rutherford left after Ms. LaVaugh arrived, and Mrs. Salamon told her that Rutherford "really has made me nervous" and had been sitting around on her couch.  Apparently, Mrs. Salamon never got the refund that Attaway was supposed to bring, and Rutherford left the old glass doors in her garage.

At 7:00 the next morning, August 22, Rutherford and Attaway went to retrieve the old doors from Mrs. Salamon's garage.  When they reached the house, Rutherford told Attaway that he had a gun in his van and said, "If I reach for that gun, you'll know I mean business." Attaway testified that this was the first time he really believed that Rutherford might actually hurt someone, yet he still did nothing about it.  While they were loading the doors, Attaway overheard Mrs. Salamon say to Rutherford, "You can just forget about the money."

4

Later that morning, between 9:30 and 10:30 a.m., the manager of a local Sears store saw Mrs. Salamon when she came by to pick up a package. She also stopped at the Consolidated Package Store and made a purchase at 10:29 a.m., according to computer sales records. After that, Rutherford was the only other person known to have seen Mrs. Salamon alive, and she was not alive long, as Rutherford's actions on that day evidence.

Around noon, Rutherford went to see Mary Frances Heaton, a woman who sometimes baby-sat for his children and with whom he had once lived for a few months. He showed her one of Mrs. Salamon's checks and asked her to fill it out. Heaton cannot read or write other than to sign her name, so she called for her thirteen-year-old niece, Elizabeth. Rutherford promised Elizabeth money if she would fill out the check as instructed. Elizabeth filled out the check the way Rutherford told her to, making it payable to Heaton, but she did not sign anyone's name on it.

Rutherford told Heaton that he owed her money for work she had done for him and asked her to accompany him. He took Heaton to the Santa Rosa State Bank, gave her the check, and sent her into the bank to cash it. Because of the blank signature line, the teller refused to cash the check; Heaton returned to Rutherford's van and told him.

5

Rutherford responded by driving them to the nearby woods, where he took out a wallet, checkbook, and credit cards wrapped in a shirt, and threw the bundle into the trees. He also signed Mrs. Salamon's name onto the check, and then they went back to the bank. Outside the bank, Heaton watched as Rutherford then endorsed Heaton's name on the check. In doing so Rutherford misspelled Heaton's name, scratched it out, and corrected it. Heaton re-entered the bank, and this time she successfully cashed the check and left with $2,000 in one hundred dollar bills. Rutherford gave Heaton $500 of those funds, and she in turn gave Elizabeth $5 for filling out the check.

Around 3:00 that afternoon, Rutherford visited his friend Johnny Perritt. He told Perritt that he had "bumped the old lady off" and showed him $1500 in cash. He wanted Perritt to hold $1400 of that amount for him. Rutherford said that he had hit the "old lady" in the head with a hammer, stripped her, and put her in the bathtub. Perritt refused to take the cash, and his mother later notified the police of Rutherford's claim to have committed a murder.

Earlier that day Mrs. Salamon had made plans to go walking that evening with Beverly Elkins and another neighbor. At 6:30 p.m. Ms. Elkins tried to contact Mrs. Salamon by phone but got no answer. She went to Mrs. Salamon's house, saw her car outside, and realized that she must still be at home. Ms. Elkins

6

rang the front doorbell.  After receiving no answer, she went around back and through the sliding glass doors saw that the television was on and that the normally calm dogs were jumping around excitedly.  Ms. Elkins retrieved a spare key to the house, met up with the other neighbor who was to have gone walking with them that night, and the two women let themselves into Mrs. Salamon's home.

When the two women entered the kitchen through the carport door, they heard water running.  They followed the sound to a little-used guest bathroom. There they were horrified to find Mrs. Salamon's naked body floating in the water that filled the tub to overflowing.  Realizing that their friend was dead, the stunned women went to call for help. When walking through the house, Ms. Elkins noticed that Mrs. Salamon's eyeglasses were on the kitchen floor underneath the counter. The makings of a tomato sandwich were out on the counter.  Mrs. Salamon had liked to eat tomato sandwiches for lunch.

When crime scene investigators arrived they found three fingerprints on the handle of the sliding door to the bathtub, one fingerprint on the tile wall of the tub, and a palm print on the window sill inside the tub with the fingers up and over the sill as though the person had grabbed it. All of those  prints were later identified as Rutherford's.  Blood was spattered on the bathroom walls and floor.  According to

an expert, the spatter pattern indicated that the blows occurred while Mrs. Salamon was sitting or kneeling on the bathroom floor.

Mrs. Salamon's naked body floated face-up in the water. She had been viciously beaten. There were bruises on her nose, chin, and mouth and a cut on the inside of her lip consistent with a hand being held forcefully over her face. Her lungs showed signs of manual asphyxiation, apparently from someone covering her nose and mouth. Her arms and knees were bruised and scraped, and her left arm was broken at the elbow. Of the three large wounds on her head, two were consistent with being struck with a blunt object or having her head slammed down. The other wound, a puncture that went all the way to the bone, appeared to be from a blow with a claw hammer or screwdriver. Her skull was fractured from one side to the other.

Severe as those injuries were, none of them were the actual cause of Mrs. Salamon's death. Although Rutherford had beaten and smothered her, she had water in the lungs. That shows the 63-year-old widow was still alive when Rutherford stripped off her clothes and placed her in the bathtub to drown.

**B.**

Early in 1986, Rutherford was tried for the first degree murder and armed robbery of Mrs. Salamon. He was represented by privately retained counsel.

During the trial, Rutherford moved for a mistrial based on a discovery violation by the prosecution, but the court reserved ruling and proceedings continued. The Santa Rosa County jury found Rutherford guilty and, by an eight-to-four vote, recommended a sentence of death. Rutherford then renewed his motion for a mistrial and the trial court granted it.

In the fall of 1986, after a change of venue to Walton County, Rutherford was retried. He was represented by two public defenders, William Treacy and John Gontarek. During the guilt stage of the trial, Rutherford took the stand and tried to explain his prints in the bathroom by claiming that Mrs. Salamon had asked him to realign the shower door when he was at her house on August 21 (the day before she was killed) because her nieces and nephews had knocked the door off its track. The state thereafter proved that Mrs. Salamon did not have any nieces or nephews, and according to Beverly Elkins, her close friend, no young children had visited Mrs. Salamon's house in the weeks prior to her death. Rutherford denied the testimony of the three witnesses that he had confided to them his plans to murder a woman. According to Rutherford, he never would have said such things "because I've got a good mother." He insisted that every one of the witnesses against him was lying.

On October 2, 1986, the jury found Rutherford guilty. During the penalty phase, the defense presented character evidence and testimony about Rutherford's childhood, his family, his service as a Marine during the Vietnam War, and his nervousness, nightmares, and night sweats since returning from Vietnam. The jury recommended death, this time by a seven-to-five vote. The trial court imposed a death sentence based on three aggravating circumstances: the murder was especially heinous, atrocious, and cruel; it was cold, calculated and premeditated; and it was committed in the course of a felony (robbery) and for pecuniary gain.

The Florida Supreme Court affirmed Rutherford's conviction and death sentence, and the United States Supreme Court denied his petition for writ of certiorari. Rutherford v. State, 545 So. 2d 853 (Fla.) ("Rutherford I"), cert. denied 493 U.S. 945, 110 S. Ct. 353 (1989).

Rutherford then began the long process of collateral review by filing a motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850. In 1996, after conducting an evidentiary hearing on Rutherford's claims of ineffective assistance of trial counsel, the trial court denied the 3.580 motion as to all of his claims. The Supreme Court of Florida affirmed the denial. Rutherford v. State, 727 So. 2d 216 (Fla. 1999) ("Rutherford II").

10

Rutherford then petitioned the state trial court for a writ of habeas corpus, this time raising several claims of ineffective assistance of counsel by his two appellate attorneys during his direct appeal. His petition was denied, and the state supreme court affirmed the denial. Rutherford v. Moore, 774 So. 2d 637 (Fla. 2000) ("Rutherford III").

On April 2, 2001, Rutherford filed a 28 U.S.C. § 2254 petition for a writ of habeas corpus in the United States District Court for the Northern District of Florida. That court denied the petition and refused to grant relief. It initially granted but then vacated a certificate of appealability. We then granted Rutherford a certificate of appealability on the following three issues: (1) whether his second trial violated the Double Jeopardy Clause of the Fifth Amendment; (2) whether relief should have been granted on his penalty phase ineffective assistance of counsel claim; and (3) whether his trial counsel had a conflict of interest that rendered their representation of him ineffective.

## II.

Because the Florida court adjudicated Rutherford's claims on the merits, the Antiterrorism and Effective Death Penalty Act prevents a federal court from granting habeas relief unless the state court's decision either was "contrary to, or involved an unreasonable application of, clearly established Federal law, as

11

determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Id. § 2254(e).

"A state court decision is 'contrary to' clearly established federal law if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). An objectively unreasonable application of federal law occurs when the state court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Id.

The Supreme Court has held that § 2254(d)(1) imposes a "'highly deferential standard for evaluating state-court rulings,'" Woodford v. Visciotti, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002) (quoting Lindh v. Murphy, 521 U.S.

12

320, 333 n.7, 117 S. Ct. 2059, 2066 n.7 (1997)), a standard "which demands that state-court decisions be given the benefit of the doubt," id. More than once the Supreme Court has instructed lower federal courts that the statute requires more than mere error, and more even than clear error, before federal habeas relief may be issued. E.g., Mitchell v. Esparza, 540 U.S. 12, __, 124 S. Ct. 7, 12 (2003) ("We may not grant respondent's habeas petition, however, if the state court simply erred . . . ."); Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166, 1175 (2003) ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Early v. Packer, 537 U.S. 3, 11, 123 S. Ct. 362, 366 (2002) (State court "decisions which are not 'contrary to' clearly established Supreme Court law can be subjected to habeas relief only if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law . . . ."); Williams  v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495, 1522 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

**A.**

The Double Jeopardy Clause of the Fifth Amendment provides that no person "shall . . . be subject for the same offence to be twice put in jeopardy of life

or limb." U.S. Const. Amend. V. Rutherford contends that his retrial put him in jeopardy a second time in violation of that constitutional guarantee.

During Rutherford's first trial, the state elicited testimony from two witnesses that Rutherford had told them he planned to kill a woman to get money.[1] The two witnesses were listed on the state's witness list, but the prosecutor did not advise Rutherford's counsel of the nature of their testimony as required by the trial court's discovery order. Rutherford moved for a mistrial, the court reserved ruling, and the trial continued. After the jury found Rutherford guilty and recommended death, the court granted Rutherford's motion for a mistrial, finding that the "discovery violation was knowing, and therefore willful."

Where, as here, a mistrial was granted upon a defense motion, a retrial does not violate the Double Jeopardy Clause, unless the state "intended to 'goad' the defendant into moving for a mistrial" during the first trial. Oregon v. Kennedy, 456 U.S. 667, 676, 102 S. Ct. 2083, 2089 (1982). Retrial is barred only if the "conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant" into making the motion. Id. at 679, 102 S. Ct. at 2091.

---

[1] At Rutherford's second trial, three witnesses testified that he had made statements about his plans to kill a woman. One of those three, Attaway, did not testify about those statements at the first trial. See Rutherford I, 545 So. 2d at 855.

The prosecutor's intent is a question of fact.  United States v. Vallejo, 297 F.3d 1154, 1162 (11th Cir. 2002).

In response to this same double jeopardy claim, the Florida Supreme Court held on direct appeal that the retrial did not violate Rutherford's double jeopardy rights.  Rutherford I, 545 So. 2d at 855.  That holding was based upon that court's finding that at the time the prosecutor failed to inform the defense of the two witnesses' testimony, the prosecutor's goal was to use the evidence to convict Rutherford, not cause a mistrial.  Id.  The Florida Supreme Court reasoned that the prosecutor had willfully taken the action that violated the discovery order out of a misapprehension of the extent of his discovery obligations, not with any intent to provoke the defense into moving for a mistrial.  Id.

Rutherford has not shown by clear and convincing evidence that the Florida Supreme Court's factual finding about the prosecutor's intent is unreasonable in light of the evidence in the state court record.  See 28 U.S.C. § 2254(d)(2).  He contends that because the first trial court, in granting the mistrial, described the discovery violation as "knowing, and therefore willful," it must have meant that the prosecutor intended to force a mistrial.  There are two problems with that argument.  First, under Florida law a "willful" discovery violation is merely one that is not "inadvertent."  See Richardson v. State, 246 So. 2d 771, 775 (Fla.

15

1971). There is no indication that when the Florida trial court judge called the discovery violation "willful," he was using that term in a way different from its meaning under Florida law. The judge did not say that the prosecutor had intended to provoke a mistrial.

Second, even if the trial judge had said that, the Florida Supreme Court could not have been clearer in finding to the contrary. To the extent of any inconsistency in fact findings or other matters, the Florida Supreme Court is supreme over that state's trial courts; to the extent of any inconsistency its findings are the ones we take to be those of the state courts. The finding that the prosecutor did not intend to goad the defense into moving for a mistrial is presumed correct, see 28 U.S.C. § 2254(e)(1), and Rutherford has not carried his burden of rebutting that presumption by clear and convincing evidence, see id.

Nor has Rutherford demonstrated an unreasonable application of clearly established federal law as determined by the Supreme Court. Given the factual finding about the prosecutor's intent, the Florida Supreme Court's conclusion that there was no violation of the Double Jeopardy Clause was required by the Kennedy decision. See Kennedy, 456 U.S. at 676, 102 S. Ct. at 2089.[2]

---

[2] The state argues that because Rutherford's first trial ended in a conviction, the subsequent declaration of a mistrial does not implicate the Double Jeopardy Clause. See Hawkins v. Alabama, 318 F.3d 1302, 1309 (11th Cir. 2003). Because the state courts and district

16

## B.

Rutherford contends that his two trial counsel rendered ineffective assistance during the penalty phase of his second trial by failing to: adequately investigate and present evidence about Rutherford's alcoholism, childhood, marital difficulties, and experiences in Vietnam; obtain and present expert mitigating evidence about his mental health; and object to the testimony of three witnesses who repeated statements that had been made by the victim, Mrs. Salamon, about Rutherford.

The Supreme Court clearly established the federal law governing ineffective assistance claims in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). Rutherford's burden is two-fold. First, he must demonstrate that his counsel's performance was "outside the wide range of professionally competent assistance." Id. at 690, 104 S. Ct. at 2066. Second, he must establish a reasonable probability that, but for his counsel's deficient performance, the result of the proceedings would have been different. Id. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Both showings are necessary for any relief; failure to establish

court did not address this argument, and because Rutherford's second trial did not violate the Double Jeopardy Clause in view of the prosecutor's lack of goading intent, we need not reach that issue.

17

either is fatal and makes it unnecessary to consider the other.  Id. at 697, 104 S. Ct. at 2069.

In assessing Rutherford's claim that his trial counsel were ineffective we must keep in mind that "[j]udicial scrutiny of counsel's performance must be highly deferential."  Id. at 689, 104 S. Ct. at 2065.   In addition to the deference to counsel's performance mandated by Strickland, the AEDPA adds another layer of deference – this one to a state court's decision – when we are considering whether to grant federal habeas relief from a state court's decision.   Woodford, 537 U.S. at 24, 123 S. Ct. at 360 (section 2254(d)(1) imposes a "highly deferential standard for evaluating state-court rulings") (internal marks and citation omitted). Rutherford must do more than satisfy the Strickland standard.  He must also show that in rejecting his ineffective assistance of counsel claim the state court "applied Strickland to the facts of his case in an objectively unreasonable manner."  Bell v. Cone, 535 U.S. 685, 699, 122 S. Ct. 1843, 1852 (2002).

**1.**

During the penalty stage of Rutherford's second trial, his trial counsel presented testimony from his father, his sister, his ex-wife (with whom he had reconciled and whom he was planning to remarry), his sister's father-in-law, and Rutherford himself.  Counsel's penalty stage strategy was to paint Rutherford, who

18

continued to insist that he was innocent, as "a good fellow, [a] good father, a good citizen, [a] loyal Marine, . . . [a] loyal church member;" in short, to emphasize his "goodness."

Rutherford, his father, and his sister all testified about Rutherford's childhood. They told the jury about Rutherford living on a farm with his parents and seven siblings, and how the children had to do chores and work around the farm. They brought out that Rutherford's father sometimes worked as a truck driver and was away from home. The jury heard that after Rutherford's father temporarily abandoned the family, Rutherford and his older brother kept the farm going while their mother took in washing and ironing to make ends meet. As Rutherford grew up, he and his father had what his sister described as "a few spats," but overall "they got along fine." Rutherford's sister also testified that he got along with his siblings and she characterized their parents as loving. During his own testimony Rutherford acknowledged that he did not get along with one of his brothers, but he agreed with his sister that he had good relationships with his six other siblings and with his parents.

Rutherford's ex-wife told the jury about their family. During their fourteen-year marriage, they had four children. They divorced, and she left the children with him. They reconciled approximately a year before Rutherford was arrested

19

and had planned to remarry. Their fifth child was born while Rutherford was in jail awaiting trial. His ex-wife described Rutherford as a caring and involved father, a loving, helpful, and attentive husband, and an unselfish person.

Rutherford testified about his military service. He said that at the age of nineteen he had volunteered for the Marines during the Vietnam War. He had received medals for marksmanship training. According to Rutherford, he had spent thirteen months in the demilitarized zone, during which time he slept in a foxhole nightly, heard shots and bombs daily, and saw men die regularly.[3] He described his combat experience to the jury as "hell," but emphasized that he stayed for his full tour of duty because "I ain't no quitter." Rutherford remained in the reserves for four additional years and received some medals and ribbons for his service. When one of his counsel asked Rutherford to go into more detail about his military experiences for the judge and jury, Rutherford refused, responding: "That's enough of that. I don't care to talk about that."

The four family members who testified all described how Rutherford returned from Vietnam nervous and jittery. His sister's father-in-law said that

---

[3] During his penalty phase testimony, Rutherford stated that he served in combat in the DMZ for thirteen months. However, during the 3.850 evidentiary hearing, Rutherford's expert testified that the records showed Rutherford had served five-and-a-half months in combat in the DMZ and the rest of his tour of duty elsewhere.

Rutherford would pace the floor, and his ex-wife said that for the first three years Rutherford suffered from nightmares and night sweats. She and Rutherford both testified that he had been exposed to the chemical Agent Orange, and they believed that exposure had harmed their children. The oldest child was born with facial deformities and a skin disease, another child suffers from a blood disease, and the youngest has heart murmurs and seizures. Rutherford contacted the Veterans Administration about getting tested for Agent Orange exposure to qualify his children for benefits, but he had not yet been tested when he went to jail.

On the stand during the penalty phase, Rutherford remained defiant and continued to protest his innocence. When the prosecutor asked him why he had robbed Mrs. Salamon, Rutherford responded: "I did not steal [the check], why didn't you steal it?" He said that until the jury convicted him, "I thought that I had a sensible jury," and he went on to accuse the prosecution of framing him and hiding evidence. Rutherford ended what was supposed to be his statement to the jury about why he should not die by threatening the prosecutor: "You are going to get it." Because the courtroom bailiff and deputies were concerned over Rutherford's behavior and because of his threat to the prosecutor, he was shackled during the closing arguments of the penalty phase.

21

After the jury returned its verdict recommending a death sentence, Rutherford's attorneys presented to the judge two mental competency evaluations that had been produced before the first trial. Rutherford had insisted that his attorneys not offer any mental health evidence, but counsel presented the competency reports to the judge anyway. The jury did not see them.

One competency evaluation, performed by Dr. Barbara Medzerian, reported that Rutherford said he was "living in hell" since returning from Vietnam, had nightmares and night sweats, was depressed, and was an alcoholic. That report also detailed past episodes of violence, including an episode where Rutherford struck at his father and broke his hand hitting the wall, and claimed afterward to have no memory of the incident. Another time, Rutherford beat up one of his brothers, was arrested for assault and battery, and spent five days in jail and one year on probation. The report said that Rutherford described his experience in court on that charge as "a joke." In her report, Dr. Medzerian explained that these violent episodes were consistent with Rutherford's drinking problem. In her opinion, Rutherford suffered symptoms of an anxiety disorder related to his combat experiences, exhibited anti-social personality features, and suffered from alcoholism. Even so, he was, in her view, mentally competent to stand trial.

22

The other pre-trial evaluation was conducted by Dr. Philip Phillips, and it reported that Rutherford had trouble sleeping, was nervous and depressed, and was suspicious of others. It also discussed his history of alcoholism and his previous arrest, and reported that he had received court-ordered counseling for his drinking problem, presumably after the assault against his brother.

**2.**

The Florida courts rejected Rutherford's contention that his trial counsel was ineffective for failing to investigate and use additional mitigating evidence about his childhood, Vietnam experience, alcoholism, and troubled marriage. The Florida Supreme Court characterized the evidence of alleged childhood abuse that Rutherford presented during the state collateral proceeding as inconclusive, Rutherford II, 727 So. 2d at 225; it emphasized that Rutherford had hindered his attorneys' investigation into both his childhood and his Vietnam experiences; and it found that his attorneys had strategically decided not to present any evidence to the jury that would conflict with their penalty stage theme that Rutherford was basically a good person. Id. at 224-25. Much of the "additional" evidence introduced during the state collateral hearing, the Florida Supreme Court noted, was cumulative of that which had been put in during the penalty phase of the trial.

23

Id. In any event, the Court concluded, even if trial counsel's performance was somehow deficient, Rutherford was not prejudiced. Id. at 225-26.

We need not reach the question of whether that alternative basis for the state court decision, the lack of prejudice, passes muster under § 2254(d). It is unnecessary to do so, because we conclude the holding that counsel's performance in this regard was not constitutionally deficient is not objectively unreasonable. We will address in turn Rutherford's contentions of inadequate investigation and presentation of mitigating evidence as they relate to his problem with alcohol, his allegedly abusive childhood, his marriage, and his Vietnam experience.

About Rutherford's problem with alcohol, his trial counsel were informed. The two pre-trial competency reports, with which counsel were familiar, covered Rutherford's drinking problem. One of those reports, Dr. Medzerian's, explained that Rutherford's violent outbursts were consistent with alcoholism. Both reports indicated that Rutherford had received counseling for his alcoholism. Counsel knew about the problem but made a strategic decision not to present any evidence of it to the jury or to investigate it any further.

As the Florida Supreme Court explained, Rutherford's trial counsel did not need to investigate his alcoholism any further to understand its implications and make a reasonable decision about it. Any evidence of alcoholism would have

opened the door to the jury hearing evidence about Rutherford's past violence, thereby undermining the plan to present Rutherford as a good, hard-working family man. There is nothing unreasonable about the Florida Supreme Court's findings or legal conclusions in regard to this subpart of the ineffective assistance of counsel issue.

About evidence of Rutherford's childhood, one of Rutherford's brothers, William, testified at the 3.850 hearing that their father beat their mother and got "pretty rough" on the children. Rutherford contends that his attorneys were ineffective for failing to interview this brother and present his testimony at the penalty phase.

The Florida Supreme Court found that William's testimony was "not conclusive of an abusive situation," Rutherford II, 727 So. 2d at 225, which is to say that testimony did not prove Rutherford had been abused as a child. Although Rutherford now tries to characterize his childhood as cruel and terrible, the state court finding to the contrary is presumed to be correct, see § 2254(e)(1), and he has not carried his burden of rebutting that presumption by clear and convincing evidence.

At trial, Rutherford's sister testified that Rutherford had "a few spats" with his father but otherwise got along with his parents. She characterized their parents

as loving. At the 3.850 hearing, Rutherford's brother Earl testified that he never knew of his parents fighting when the siblings were young, and that all the children had grown up with good relationships with their parents. He summarized things by saying: "we had some good bringing up." Rutherford's mother also testified at the 3.850 hearing. Although she talked about the family's financial struggles and Rutherford's father's drinking, she never indicated that he was abusive. Moreover, Rutherford's own penalty phase testimony described the generally good relationships that had existed within his family, and he never mentioned abuse.

To the extent there were any shortcomings in the investigation of Rutherford's family life, he is responsible for them. He did his best to hinder his attorneys' efforts. Counsel and their investigators asked Rutherford for the names of anyone they could interview and then talked with the people he named, even if Rutherford insisted that the person was not worth contacting. Also, in accordance with standard practice, when Rutherford's case was assigned to the public defender's office an assistant interviewed him to get the names of his family members. Rutherford failed to disclose all of them.

When one of the attorneys and an investigator tried to visit his parents' home to interview them, they could not locate the address Rutherford had given

them.  When the attorneys asked him about it, he replied:  "I told my mom and dad and wife not to come and talk to you folks."  That was confirmed when counsel and their investigators finally located Rutherford's parents.  They spent over two hours trying to interview the parents, but had difficulty getting them to cooperate.  Exasperated, the lead investigator on the case finally told Rutherford's father:  "We are trying to save your son's life."  The elder Rutherford became angry and snapped at the investigator.  That effectively ended the interview.  Rutherford had also instructed his family members not to go to his attorneys' offices to talk to them.

About his marital difficulties, Rutherford's ex-wife testified at the penalty stage concerning their divorce, their reconciliation, and Rutherford's good parenting of the children.  Rutherford himself testified about his marriage and family life and that he cared for the children when his wife left.  Witnesses at the 3.850 hearing did offer greater detail about the couple's divorce; for example, they told about Rutherford's having traveled to California to see his ex-wife.

There is no indication that Rutherford's trial counsel unreasonably failed to investigate his marital history and difficulties.  On the contrary, counsel interviewed the two people most knowledgeable about the marriage, Rutherford and his ex-wife, and called each of them as penalty phase witnesses.  The Florida

27

Supreme Court held that counsel knew about Rutherford's marital history, and that the evidence on the subject presented at the 3.850 hearing was essentially cumulative. Rutherford II, 727 So.2d at 224-25. That decision easily passes review under § 2254(d).

About the investigation into his military experience, again Rutherford did what he could to impede his counsels' best efforts and brought about any shortcomings in that part of the investigation. When his attorneys repeatedly tried to interview him about Vietnam, Rutherford refused to answer their questions. Counsel prepared the necessary paperwork to obtain copies of his military records, but Rutherford adamantly refused to sign the release. They asked his family to provide any information or records they had about Rutherford's time in the military, but the family continued their pattern of non-cooperation, a pattern that Rutherford had set into motion. One of the two counsel testified that he remembers "chewing [Rutherford] out unmercifully . . . telling him things like . . . 'This is your life at stake and we are the people that are going to do something or not be able to do something.'" It did no good. Counsel's pleas went unheeded.

Nonetheless, while Rutherford was on the stand testifying during the penalty phase, counsel did ask him about his Vietnam experiences, and for the first time Rutherford answered the questions. As counsel recounted it: "I about fell off

my chair because there were the very questions that he refused to answer to me in the months of preparation . . . . And, of course, the old rule of [d]o not ask the question unless you know the answer, I threw it out and went with it full bore best I could." Counsel's full-bore efforts were successful to some extent. Under his questioning, Rutherford described to the jury how he had slept in a foxhole, heard shots and bombs every day, been shot at, and seen a lot of men die. He said he had spent thirteen months in combat. He described it as "hell."

Even then, however, Rutherford again blocked his counsel's efforts to present the full details of his service in Vietnam and his military career. After revealing for the jury far more about Vietnam than he had previously told his own attorneys, Rutherford responded to one of his counsel's follow-up questions with: "That's enough of that. I don't care to talk about that." And he didn't talk about it any more.

At the 3.850 hearing, Rutherford's current counsel presented an expert to analyze the history of Rutherford's unit during the dates he was in Vietnam and thereby fill in the details of what Rutherford had testified to during his penalty stage. The expert gave his opinion about the conditions in which Rutherford must have lived and fought. Rutherford contends that his trial counsel should have discovered and presented similar expert opinion information at the penalty stage

29

and even should have gone so far as to obtain a court order to force the military to turn over Rutherford's records without his permission.

However, under Strickland the duty is to investigate to a reasonable extent, 466 U.S. at 691, 104 S. Ct. at 2066, and that duty does not include a requirement to disregard a mentally competent client's sincere and specific instructions about an area of defense and to obtain a court order in defiance of his wishes. See Gilreath v. Head, 234 F.3d 547, 550 n.10 (11th Cir. 2000) ("We readily conclude that trial counsel – by relying on Petitioner's instruction not to present mitigating mental health and alcohol abuse evidence – did not perform in an unreasonable manner."); Johnston v. Singletary, 162 F.3d 630, 642 (11th Cir. 1998) ("the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions") (internal marks and citation omitted); Hance v. Zant, 981 F.2d 1180, 1183-84 (11th Cir. 1993) (counsel's agreeing to capital defendant's wishes not to contact his family did not amount to ineffective assistance under the circumstances); Tafero v. Wainwright, 796 F.2d 1314, 1320 (11th Cir. 1986) ("a defendant's decision communicated to his counsel as to who he wants to leave out of the investigation, while not negating the duty to investigate, does limit the scope of the investigation"); see also Foster v. Strickland, 707 F.2d 1339, 1343 (11th Cir. 1983) ("In light of Foster's adamance,

30

Mayo had an ethical obligation to comply with his client's wishes and was thus unable to present an insanity defense."). We agree with the Florida Supreme Court's decision about this part of Rutherford's ineffective assistance claim, including its observation that "Rutherford's uncooperativeness at trial belies his present claim that his trial counsel was deficient for not investigating and presenting mitigation regarding his harsh childhood and military history," Rutherford II, 727 So. 2d at 225.

For all of these reasons, the Florida Supreme Court's decision rejecting Rutherford's claim that his trial counsel rendered ineffective assistance by not investigating more thoroughly his alcoholism, childhood, marriage, and military experience is not objectively unreasonable.

**3.**

The Florida courts rejected Rutherford's contention that his trial counsel were ineffective for failing to investigate and use the mental health mitigating circumstance evidence that his new counsel presented at the state 3.850 evidentiary hearing. At that hearing, Rutherford presented testimony from two psychologists who had studied his military and medical records, interviewed him, and conducted extensive psychological tests. Dr. James Larson and Dr. G. Robert Baker both diagnosed Rutherford as suffering from post-traumatic stress disorder

31

and alcoholism stemming from his experiences in Vietnam. They also testified that Rutherford had undergone counseling at a clinic after he assaulted his brother, and he had spoken with a Veteran's Administration counselor, as well. Further, Dr. Larson opined that at the time of Mrs. Salamon's murder, Rutherford was under extreme emotional stress due to the "stressors" of his wife returning and his drinking.

As a preliminary matter, we note that Dr. Larson and Dr. Baker had the benefit of far greater cooperation and, as a result, access to more information than Rutherford's trial counsel had. We have already discussed how uncooperative, and indeed obstructive, Rutherford was with the two attorneys who had the unenviable task of defending him. In sharp contrast, by the time Rutherford got to the state collateral stage of the proceedings he had apparently become a model of cooperation, taking the necessary steps to insure that Dr. Larson and Dr. Baker received his military records and speaking to them extensively about his time in Vietnam.

After reviewing the additional evidence offered at the 3.850 hearing, the Florida trial court held, and state supreme court agreed, that Rutherford's trial counsel were not ineffective for failing to obtain a mental health expert specifically to develop evidence in mitigation. See Rutherford II, 727 So. 2d at

218-19. The state courts reasoned that Rutherford's attorneys were aware of possible additional mental health evidence through the pre-trial competency reports they had received and their knowledge that Rutherford had received some counseling, but that counsel decided that it was unnecessary to obtain and present more detailed mental health evidence. That decision, the state courts concluded, was a sensible one in light of the strategy to "humanize" Rutherford and portray him as a hard-working, family-oriented "Boy Scout" type. Id. at 222.

In addition, as the Florida Supreme Court explained, some mental health evidence was presented at the penalty phase through lay testimony and, for the judge, through the competency evaluations. In the alternative, the state courts held that it was not reasonably probable that the jury's recommendation or the judge's sentence would have been different had they heard more detailed mental health mitigation. Id. at 225-26. Because it is clear to us that the prejudice prong holding is not objectively unreasonable, we need not address the performance prong holding.

The Florida Supreme Court applied the proper prejudice analysis. It added the mental health mitigating evidence presented at the Rule 3.850 hearing to all of the mitigating evidence that was presented at the penalty stage, and then viewed the resulting total against all of the aggravating circumstance evidence in order to

33

determine whether the additional evidence created a reasonable probability of a different result.   Rutherford II, 727 So. 2d at 225-26;  see Williams v. Taylor, 529 U.S. 362, 397-98, 120 S. Ct. 1495, 1515 (2000) (the court should "evaluate the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding– in reweighing it against the evidence in aggravation").

Having conducted the correct analysis, the Florida Supreme Court concluded that Rutherford was not prejudiced, a conclusion that was not objectively unreasonable.  First, this is not a case where the jury heard no evidence about the defendant's mental and emotional state.  It did hear evidence about that through the testimony of five lay witnesses, including Rutherford himself.  All of these witnesses testified about the effects Vietnam had on Rutherford and described his symptoms.  The jury heard that Rutherford suffered as a result of serving in Vietnam.  Witnesses described how he came back from there nervous and jittery, and his ex-wife testified about his nightmares and night sweats. Evidence was presented about the divorce Rutherford had gone through.  There was also evidence before the jury of several other possible non-statutory mitigating factors.

In other words, this is not a situation like the one in <u>Williams v. Taylor</u> or <u>Wiggins v. Smith</u>, 539 U.S. 510, 123 S. Ct. 2527 (2003), where the jury heard very little mitigating circumstance evidence and heard none at all about the type of mitigation presented during the post-conviction proceedings. For example, in <u>Wiggins</u> the evidence the jury did not hear was the defendant's long history of severe physical and sexual abuse at the hands of his alcoholic mother and various foster parents. That abuse included going for days without food, his hospitalization for physical injury, and repeated rapes and gang-rapes. <u>Wiggins</u>, 539 U.S. at __, 123 S. Ct. at 2533. The abuse occurred throughout his childhood, teenage years, and even into early adulthood and was documented in medical, school, and social services records. <u>Id.</u> The Supreme Court aptly described it as the defendant's "excruciating life history." <u>Id.</u> at __, 123 S. Ct. at 2543. All that was offered in mitigation in <u>Wiggins</u> was that the defendant had no prior convictions. <u>Id.</u> at __, 123 S. Ct. at 2533; <u>see</u> <u>also</u> <u>Williams</u>, 529 U.S. at 395-98, 120 S. Ct. at 1514-15 (counsel failed to introduce "the comparatively voluminous amount of evidence" in his client's favor, including evidence of a "nightmarish childhood," offering instead only a "sole argument in mitigation"). This case is not <u>Wiggins</u> or <u>Williams</u>.

35

A second reason that it was not objectively unreasonable for the Florida Supreme Court to decide that Rutherford had not established prejudice is that the expert testimony he contends should have been presented would have come with a price. By contrast, in <u>Wiggins</u> the Court explained that presenting the evidence of abuse would not be "counterproductive" or inconsistent with the other evidence being presented. <u>See</u> 539 U.S. at __, 123 S. Ct. at 2537, 2543.

Rutherford's attorneys presented him to the jury as a hard-working, good family man who had served his country and suffered as a result. They put forward witnesses who testified to that effect. Although expert testimony about his mental health probably would have lent weight to the suffering aspect of the portrayal, it also would have placed damaging information before the jury. Although there was testimony at the penalty stage about Rutherford having "a few spats" with his father, his violent episodes did not come out. The jury never heard evidence that Rutherford had a history of abusing alcohol or that he had two violent episodes, one of which led to a criminal charge which Rutherford denigrated as "a joke."

The reports of Dr. Larson and Dr. Baker, the two psychologists Rutherford presents as exemplars of the experts who should have been presented at the penalty stage, contain repeated references to Rutherford's abuse of alcohol. Dr. Larson also testified in the Rule 3.850 hearing that Rutherford had an

36

"exaggerated" temper and was inclined to be "irritable" and "angry." He referred to Rutherford's prior criminal charge. Dr. Baker also discussed Rutherford's abuse of alcohol at some length in his testimony, and he said that Rutherford was not able to relate to and care for people. Putting experts like Dr. Larson or Dr. Baker on the stand during the penalty phase would have opened up all of these topics and could well have been more harmful than helpful to Rutherford.

A third reason why the Florida Supreme Court's decision that Rutherford had not established prejudice is not objectively unreasonable is that this is not a case where the weight of the aggravating circumstances or the evidence supporting them was weak. The jury heard witnesses describe how Rutherford planned the brutal murder of a helpless widow in advance and bragged about how he would get away with it, saying he "wouldn't do the time but he was damn sure gonna do the crime." They heard undisputed evidence about the savage injuries Rutherford inflicted on Mrs. Salamon, brutally beating her before finally stripping her naked and drowning her in her own bathtub. They heard that he stole Mrs. Salamon's checkbook and manipulated an illiterate woman and her young niece into helping him get money out of Mrs. Salamon's account. There is no reasonable probability that the jury, if only it had heard the testimony of the two psychologists, would have concluded that this long-planned, deliberate, and cruel murder for monetary

gain was mitigated to any appreciable extent by the fact that Rutherford was, as one expert described it, under the influence of "stressors" because of his drinking and getting back together with his wife.

This is not a case like Williams, where the state established only one aggravating circumstance and the defense failed to present available mitigating evidence that both rebutted the sole aggravating factor and added mitigating factors. See 529 U.S. at 370-71, 120 S. Ct. at 1500-01. This is, instead, a case in which the state courts' determination that the petitioner had failed to establish Strickland-type prejudice from the failure to present certain mitigating circumstance evidence is not objectively unreasonable.

**4.**

We turn now to Rutherford's contention that his trial counsel was ineffective for failing to object to portions of the penalty phase testimony of Lois LaVaugh, Richard LaVaugh, and Beverly Elkins. Specifically, Rutherford claims that his counsel should have raised hearsay objections to: Lois LaVaugh's testimony that on the day before the murder Mrs. Salamon said that Rutherford stayed around her house and made her nervous; Richard LaVaugh's testimony that Mrs. Salamon said she was scared of Rutherford; and Beverly Elkins' testimony that Mrs. Salamon said she was frightened of Rutherford, that he hung around her

house, and that she worried that he had intentionally installed her glass doors so that they would not lock. The prejudice argument that Rutherford makes is that because his attorneys did not object to this hearsay evidence, the trial court relied upon it in finding the aggravating factor that the crime was cold, calculated, and premeditated – one of the three aggravating circumstances found in the case.

The Florida Supreme Court concluded that even without this testimony the trial court would have found the cold, calculated, and premeditated aggravating circumstance; therefore, there was no prejudice from the failure to object.   In reaching that conclusion, the Court considered the totality of the evidence supporting the existence of the aggravating circumstance and noted that in affirming the existence of it on direct appeal, the Court itself had not even referred to the testimony in question.  Rutherford II, 727 So. 2d at 221.  Not only is the Florida Supreme Court's decision on this point objectively reasonable, in light of the overwhelmingly deliberate and brutal aspects of the murder, no other conclusion is possible.

## C.

Finally, we turn to Rutherford's claim that his trial counsel was ineffective for revealing to the judge that Rutherford had rejected a plea offer.  While the jury deliberated Rutherford's sentence, one of his attorneys told the court:  "I did

inform the defendant of the possibility of if [sic] he did enter a plea in this case that he would receive, in my opinion, a life sentence from Your Honor and a recommendation of a life sentence from the State Attorney's Office . . . ." Rutherford contends that his attorneys revealed this information in order to protect themselves from an ineffective assistance claim, thereby placing their own interests above his and making it possible for the judge to consider Rutherford's refusal to enter a guilty plea when imposing sentence. (There is no indication that the judge actually did so.)

Rutherford argued in his state 3.850 motion that his trial counsel was ineffective because of the alleged conflict of interest. The state trial court held the claim to be procedurally barred because it could have been raised on direct appeal but was not. The Florida Supreme Court affirmed. Rutherford II, 727 So. 2d at 218. The district court held that the claim was procedurally barred from federal habeas review. We agree.[4]

---

[4] In his state habeas petition and appeal, Rutherford changed the nature of the claim, contending that it was appellate counsel who was ineffective for failing to raise the conflict of interest argument during the direct appeal. The state courts rejected that new claim both on procedural bar grounds and, alternatively, on the merits. See Rutherford III, 774 So. 2d at 647.

In deciding Rutherford's federal habeas petition, the district court concluded that the ineffective assistance of trial counsel claim was procedurally barred, but it went on to address the merits of the ineffective assistance of appellate counsel claim. However, Rutherford did not raise the appellate level ineffectiveness claim in his federal habeas petition. Instead, in the petition he reverted back to his original claim that a conflict of interest had rendered trial counsel

40

Before a state prisoner may bring a claim in a habeas petition in federal court, he must "invok[e] one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 1732 (1999). When a state prisoner is procedurally barred from raising an issue in his state collateral attack, he may not raise the issue in a federal habeas petition unless he can show both cause and prejudice, or fit within the narrow miscarriage of justice exception. See Edwards v. Carpenter, 529 U.S. 446, 451, 120 S. Ct. 1587, 1591 (2000); Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565 (1991); see also Thomas v. Crosby, 371 F.3d 782, 814 n.17 (11th Cir. 2004). Rutherford has not shown either cause or prejudice for his failure to raise the trial level conflict of interest ineffective assistance claim, and no miscarriage of justice will result from failing to decide this claim on the merits.

## III.

The district court's denial of the petition for a writ of habeas corpus is AFFIRMED.

---

ineffective. That is the claim he has argued before us, and it is the one we decide.

WILSON, Circuit Judge, concurring:

I concur in the result of the majority's opinion, with the following additional observation. The Supreme Court instructs that "[i]n assessing prejudice in an ineffective assistance of counsel claim, we reweigh the evidence in aggravation against the *totality of available mitigating evidence*." *Wiggins v. Smith*, 539 U.S. ___, ___, 123 S. Ct. 2527, 2542 (2003) (emphasis added). The mental health expert mitigation evidence could have provided the jury some context into which to put this senseless crime. In addition, it could have bolstered the lay testimony about the effects of Vietnam on Rutherford. Importantly, the jury vote at the penalty phase was far from unanimous. Given the closeness of the jury's vote to recommend a death sentence (7-5), I conclude that there exists a reasonable probability that the result of the proceedings would have been different if trial counsel had presented the mental health evidence. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984).

However, to succeed on a claim of ineffective assistance of counsel, Rutherford must also show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064. The state court determined that counsel made a reasonable strategic decision not to introduce the mental health evidence. *Rutherford v. State*, 727 So. 2d 216, 222-24

42

(Fla. 1999).  I conclude that this decision was not "objectively unreasonable" as that term was elucidated in *Wiggins*, 539 U.S. at ___, 123 S. Ct. at 2534-35, *Bell v. Cone*, 535 U.S. 685, 689, 122 S. Ct. 1843, 1852 (2002), and *Williams v. Taylor*, 529 U.S. 362, 413, 120 S. Ct. 1495, 1524-25 (2000).  Accordingly, I concur with the result of the majority's opinion and would affirm the district court's denial of Rutherford's petition for a writ of habeas corpus.